# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
### SAN ANTONIO DIVISION

| | | |
|---|---|---|
| DELMY PINEDA CRUZ, POLYANE SOARES DE OLIVEIRA DOS SANTOS, and LILIAN CASTILLO ROSADO, on behalf of themselves and all others similarly situated, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | Case No. 15-CV-326 |
| ROSE THOMPSON, Warden, Karnes County Residential Center; JUANITA HESTER, ICE Field Office Assistant Director, San Antonio District; ENRIQUE LUCERO, ICE Field Office Director, San Antonio District; SARAH SALDAÑA, Director of ICE; JEH JOHNSON, Secretary, U.S. Department of Homeland Security; in their official capacities, and THE GEO GROUP, INC., | § § § § § § § § § § § § § § | |
| Defendants. | § | |

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**Table of Contents**

I.   Background ............................................................................................................... 3

    A.   Mothers and Children Seeking Asylum Are Unnecessarily Detained at Karnes .................................................................................................... 3

    B.   Karnes Detainees Planned a Hunger Strike to Protest Their Detention ......... 6

    C.   ICE and GEO Retaliated Against the Hunger Strikers ................................... 7

        1.   ICE Officials and GEO Employees Explicitly Threatened to Separate Striking Mothers From Their Children .................................. 7

        2.   ICE Officials and GEO Employees Interrogated Striking Mothers and Locked Them in Isolation Rooms ................................ 8

        3.   ICE Officials and GEO Employees Continued Retaliating Throughout the Strike ...................................................................... 11

        4.   ICE Officials and GEO Employees Falsified Charges of Insurrection Against Hunger Strikers .................................................. 12

    D.   ICE and GEO's Actions Continue to Chill Participation in the Hunger Strike ............................................................................................... 13

II.   Legal Standard ..................................................................................................... 16

III.  Argument ............................................................................................................. 17

    A.   Plaintiffs Are Substantially Likely to Succeed on the Merits ........................ 17

        1.   The Petition and Hunger Strike Are Expressive Conduct at the Heart of First Amendment Protection .................................... 18

        2.   ICE and GEO's Actions and Threats Would Deter a Person of Ordinary Firmness from Continuing Her Strike ...................... 22

        3.   ICE and GEO's Threats Are Substantially Motivated by Deterring the Hunger Strikers ................................................... 25

        4.   GEO's Actions Are Government Actions ................................................. 29

    B.   The Chilling Effect of ICE and GEO's Threats is an Irreparable Harm ...... 31

    C.   The Balance of Harms and the Public Interest Both Favor Injunctive Relief .................................................................................................... 32

IV.   Conclusion ........................................................................................................... 33

Certificate in Support of Temporary Restraining Order…………………………………34

Exhibit List………………………………………………………………………………36

Plaintiffs Delmy Pineda Cruz, Polyane Soares de Oliveira dos Santos, and Lilian Castillo Rosado are three of nearly eighty women who wish to protest their detention at Karnes County Residential Center ("Karnes"). These women circulated a petition announcing a hunger strike for the purpose of protesting ICE's decision to detain them and their children. Defendants' agents have retaliated against Plaintiffs and other detainees on hunger strike by, among other things, threatening to separate them from their children and locking them in isolation rooms. These retaliatory actions, some of which are renewed daily, have deterred nearly all of the original hunger strikers. Plaintiffs move for a temporary restraining order and a preliminary injunction prohibiting Defendants' agents from continuing their retaliatory actions.

## I.      Background

### A.      Mothers and Children Seeking Asylum Are Unnecessarily Detained at Karnes

The entire detainee population at Karnes consists of mothers and their children.  Almost all of these families came to the United States to seek asylum from life-threatening violence in their home countries.  Federal immigration law grants Immigration and Customs Enforcement ("ICE") the discretion to release these mothers and children while their asylum[1]  applications are pending.  Instead, ICE has chosen to detain mothers and children at Karnes.  Such detention typically lasts several months before there is a final decision on their asylum applications.

ICE's choice to detain these asylum-seekers is a political one, and the Secretary of Homeland Security has not been shy about that.  The Department of Homeland Security has repeatedly asserted that the purpose of detaining families is to deter further migration from

---

[1] Under domestic law, asylum-seekers who have previously been removed from the United States are said to apply for "withholding of removal." 8 U.S.C. § 1231(b)(3). Like asylum, withholding of removal, if granted, also prevents removal to the country in which the applicant fears for her life. This brief uses the term "asylum" to refer to both asylum and withholding of removal under domestic law.

Central America.  Ex. F (Julia Preston, *Detention Center Presented as Deterrent to Border Crossings*, N.Y. Times, Dec. 16, 2014, at A18).  In years past, mothers and children seeking asylum were regularly released while their applications for asylum were pending.  Ex. O (Decl. of Barbara Hines) ¶¶  8–9.  Now, after an uptick in the number of women and children fleeing from Central America, the Department of Homeland Security has created nearly three thousand family detention beds and started filling them in order to "send a message" that these asylum-seekers are not welcome in the United States.  Ex. F.

This type of detention is illegal under domestic and international law.  The United States Constitution prohibits civil detention for the purpose of deterrence.  *E.g.*, *Kansas v. Crane*, 534 U.S. 407, 412 (2002) (emphasizing that civil detention is not a "'mechanism for retribution or general deterrence").  The United Nations High Commissioner for Refugees also instructs that a state may not detain asylum-seekers to deter other people from seeking asylum.  U.N. High Comm'n for Refugees, Detention Guidelines § 4.1.4 (2012), *available at* http://www.unhcr.org/505b10ee9.html.[2]

Detention is inherently harmful to people who are seeking asylum.  Detention in a prison-like setting exacerbates trauma experienced by women and children who flee extreme violence in their home countries—rates of anxiety, depression and PTSD symptoms are very high among detained asylum seekers, and those rates increase the longer a person sits in detention.  Ex. G (Decl. of Luis Zayas) at ¶¶ 10–11, 19–37.  Locking children in a secure facility inhibits their

---

[2] These issues are being litigated in other courts.  *See, e.g.*, *R.I. L-R v. Johnson*, 2015 WL 737117, No. 15-cv-0011 (D.D.C. Feb. 20, 2015) (granting preliminary injunction to enjoin DHS from considering deterrence in deciding whether to detain noncitizens in family detention); *Flores v. Johnson*, No. 85-cv-4544 (C.D. Cal.) (Doc. No. 100) (motion to enforce settlement agreement filed Feb. 2, 2015).  The legality of Plaintiffs' detention is not before this Court; rather, this information is intended to give context to Plaintiffs' protest.

physical and psychological development.  *Id.*; Ex. H (Letter to President Obama from 168 Nongovernmental Organizations in Opposition to Family Detention).

Detaining mothers and children seeking asylum would be objectionable under any conditions, but the conditions women and children face at Karnes are particularly inhumane. Karnes is operated by The GEO Group, Inc., a private prison company with a troubling history of violating basic rights in the name of cutting costs.  *See generally* Ex. I (Report on Immigration Detention Quotas) at 17–22 (cataloging constitutional and human rights violations at multiple GEO-operated facilities); Ex. J (Report on Family Detention and Private Prison Companies) at 4–9, 16 (same).  GEO has not strayed from its modus operandi at Karnes.  Medical staff fail to treat potentially serious conditions.  Ex. A (Apr. 20, 2015 Decl. of Delmy Pineda Cruz) ¶ 7 ; Ex. B (Apr. 20, 2015 Decl. of Polyane Soares de Oliveira dos Santos) ¶¶ 7–8; Ex. D (Apr. 20, 2015 Decl. of Lilian Castillo Rosado) ¶¶ 10–12.  For example, Ms. Soares de Oliveira dos Santos likely has a thyroid problem—she feels a lump in her throat, and she has lost more than twenty pounds since she was detained at Karnes—but medical staff refused to test her blood until she began her hunger strike.  Ex. B  ¶ 7.  Medical staff at Karnes pulled out the wrong tooth when treating a mother's dental issue.  *Id.* ¶  8.  Moreover, the mental health services at Karnes are a window dressing.  Ex. A ¶ 8; Ex. B ¶ 9; Ex. D ¶ 13.  There are children at Karnes so desperate that they are suicidal, but in counseling sessions, the psychologist merely tells detainees that he does not have the power to release them.  Ex. A ¶ 8; Ex. B ¶ 9; Ex. D ¶ 13.  There have been many reports of sexual abuse at Karnes, both between guards and detainees, and among the older children.  Ex. D ¶ 9; Ex. K (Letter to Secretary of Homeland Security from MALDEF Regarding Sexual Abuse at Karnes); Ex. L (Report on Human Rights Violations at Karnes).  Nevertheless,

irrespective of the specific conditions of confinement at Karnes, detaining these mothers and children under any circumstances is unnecessary and inhumane.

### B.     Karnes Detainees Planned a Hunger Strike to Protest Their Detention

For reasons described above, mothers at Karnes circulated a petition to protest their detention.  The petition stated that the mothers sought their release from detention, complained of the harsh conditions endured by their children, and announced a hunger strike to protest ICE's decision to continue detaining them.  Ex. A ¶¶ 10–14; Ex. B ¶¶ 12–16; Ex. D ¶¶ 16–19; Ex. P (Decl. of Johana De Leon) ¶¶ 16–17.  Nearly eighty mothers decided to refuse meals at the Karnes dining hall during Holy Week, the week leading up to Easter.  Ex. A ¶¶ 10–14; Ex. B ¶¶ 12–16; Ex. D ¶¶ 16–19; Ex. E (Hunger Strike Petition); Ex. P ¶¶ 16–17.  Ms. Pineda Cruz delivered the petition to Johana De Leon of RAICES, an advocacy organization for immigrants, on Holy Monday, March 30, 2015.  Ex. A ¶ 15; Ex. B ¶ 17; Ex. D ¶ 21; Ex. P ¶ 17.  Mothers began refusing breakfast at the dining hall that morning.  Ex. B ¶ 32; Ex. C (Decl. of Kenia Yakeline Galeano) ¶ 8; Ex. D ¶ 22.

The only activity that the strike entailed was the mothers' refusal to visit the dining hall or accept food from the dining hall.  Ex. A ¶ 11; Ex. B ¶ 13; Ex. C ¶ 6; Ex. D ¶ 18.  The striking mothers continued drinking liquids and occasionally eating small items purchased from the commissary to ensure that they were able to care for their children.  Ex. A ¶ 11; Ex. B ¶ 13.  The strike was entirely passive and nonviolent.  The striking mothers made it clear to ICE and GEO that they were feeding their children on a regular schedule with food from the commissary.   Ex. A ¶ 11; Ex. B ¶ 13; Ex. C ¶ 6.

### C.    ICE and GEO Retaliated Against the Hunger Strikers

#### 1.    ICE Officials and GEO Employees Explicitly Threatened to Separate Striking Mothers From Their Children

The day the hunger strike began, ICE officials directed all women participating in the strike to attend a meeting with nearly a dozen ICE officials and GEO guards.  Ex. A ¶¶ 16–19; Ex. B ¶¶ 33–38; Ex. C ¶¶ 8–11; Ex. D ¶¶ 23–28.  ICE officials at that meeting asked about the purpose of the hunger strike.  The striking mothers were very clear that their strike was intended to persuade ICE to release them from detention.  Ex. A ¶¶ 16–19; Ex. B ¶¶ 33–38; Ex. C ¶¶ 8–11; Ex. D ¶¶ 23–28.  In response, ICE officials threatened that they would separate the mothers from their children if they continued with their strike.   Ex. A ¶¶ 16–19; Ex. B ¶¶ 33–38; Ex. C ¶¶ 8–11; Ex. D ¶¶ 23–28.  The ICE officials said that if the mothers continued with their hunger strike, they would be unable to care for their children, because they would not be "mentally sharp."  Ex. B ¶ 34; *see*  Ex. A ¶¶ 16–19; Ex. C ¶¶ 8–11; Ex. D ¶¶ 23–28.  At least one ICE official, Officer Pacheco, warned Ms. Pineda Cruz against carrying out her "stupid idea."  Ex. A ¶ 18.   Officer Pacheco told Ms. Pineda Cruz that if she continued her hunger strike, ICE would take her son away and deport her.  *Id.*

Many mothers worried that their refusal to eat could be used as a pretext to diagnose them with a mental health problem and take away their children.  Ex. A ¶ 19; Ex. B ¶ 36; Ex. C ¶ 20; Ex. D ¶ 27.  ICE officials had made such threats before.  Ex. C ¶ 20.  Many of the striking mothers were intimidated into backing out of the strike because they were afraid that they would lose their children.  Ex. A ¶ 19; Ex. B ¶ 36; Ex. C ¶ 20; Ex. D ¶ 27.

### 2.    ICE Officials and GEO Employees Interrogated Striking Mothers and Locked Them in Isolation Rooms

ICE officials and GEO employees separated three of the striking mothers from the rest of the detainees, interrogated them about the strike, threatened them, and locked them in isolation rooms.  Ex. A ¶¶ 20–34; Ex. B ¶¶ 19–32, 39–40; Ex. C ¶¶ 12–30; Ex. D ¶¶ 30–31; 35–36.  The isolation rooms were small, spare rooms with exposed toilets and absolutely no privacy.  Ex. A ¶¶ 20–22; Ex. B ¶¶ 23–25; Ex. C ¶¶ 23–24.  Each room was monitored by a security camera.  Ex. A ¶¶ 20–22; Ex. B ¶¶ 23–25; Ex. C ¶¶ 23–24.  All three women who were locked in isolation felt terrified, in part because no one would tell them how long they would be locked inside. Ex. A ¶¶ 21, 23, 24, 27, 30, 32–33; Ex. B ¶¶ 24, 26–31; Ex. C ¶¶ 15, 18, 20, 25. The three striking mothers were variously told that they were in isolation for "medical observation," pending an "investigation" into the strike, on ICE's orders, and for punishment. Ex. A ¶¶ 26, 30 (medical observation), 28 (just following orders), 44 (punishment); Ex. B ¶ 22 (for questioning and confession); Ex. C. ¶¶ 12, 14 (investigation), 17 (ICE's orders), 21 (punishment). One woman was told she would be released only if she confessed the leader of the strike. Ex. B ¶ 22.

*ICE and GEO Locked Away Children of Striking Mothers*

ICE and GEO locked away two children, Alexis Pineda and Alejandro Galeano, because their mothers were associated with the hunger strike.  Ex. A ¶¶ 20–34; Ex. B ¶¶ 39–40; Ex. C ¶¶ 12–30; Ex. D ¶¶ 30–31.

First, ICE and GEO locked away Ms. Pineda Cruz.  Ex. A ¶¶ 20–22.   She was locked up alone, in a small, dark room, without anyone telling her what was going on.  *Id.*  She remained in the room, in darkness, until guards turned on the light and locked her eleven-year-old son Alexis into the room with her.  Ex. A ¶¶ 20–34.  Later still, a GEO guard came into the room and handed Ms. Pineda Cruz a piece of paper that said she was under medical observation.  *Id.*  There

was no medical reason to hold Ms. Pineda Cruz or her son in medical observation. *Id.* Ms. Pineda Cruz insisted that she had done nothing wrong and begged for an explanation, but the guard refused to give any further answers about why Ms. Pineda Cruz and her son were locked in the isolation room. *Id.* Alexis cried and worried that he would be sent back to Honduras. *Id.* He was terribly frightened. *Id.*

Ms. Pineda Cruz and her son were ultimately locked in the room overnight. *Id.* It was very uncomfortable, because neither of them had any privacy, and Alexis was much to old to use the toilet in the same room as his mother. *Id.* The bed was not big enough for the two of them, but even if it had been, Ms. Pineda Cruz could not sleep out of anxiety. *Id.* She had no idea how long she would be locked in the room with her son. *Id.* She was not released until Tuesday, March 31, at around 11:00 in the morning. *Id.*

Ms. Yakeline Galeano was also locked in an isolation room with her son, Alejandro, who is just two years old. Ex. C ¶¶ 12–30. Shortly after she and Alejandro were locked into the room, a GEO guard required her to write a statement about the strike. *Id.* Ms. Yakeline Galeano worried that her participation in the hunger strike would be used to deport her, and used different handwriting on her statement out of fear. *Id.* When the guard returned, she insisted that she had not broken any rules, but she was merely told that she needed to remain in isolation for an investigation. *Id.* She was later told that she was being punished. *Id.* ¶ 21.

All the while, Ms. Yakeline Galeano felt afraid for her son. *Id.* ¶¶ 12–30. At two years old, he was too young to understand what was going on. *Id.* He asked to leave, and when Ms. Yakeline Galeano explained that he could not, he cried until he fell asleep around 9:00 at night. *Id.* Ms. Yakeline Galeano could barely sleep at all; there was not enough room on the bed for

her and her son to lay comfortably. *Id.* She didn't drink anything because she was on hunger strike and she did not want to have to use the toilet with her son's head laying so close by. *Id.* Nobody returned to the isolation room until 5:30 the next morning, when a GEO guard told Ms. Yakeline Galeano to wake up because she was being released. *Id.* No ICE officer ever came to speak with her about the "investigation." *Id.*

*ICE and GEO Isolated and Interrogated Another Striking Mother*

Both ICE officials and GEO employees interrogated Ms. Soares de Oliveira dos Santos in three separate sessions, asking who the leader of the strike was and who had "put the idea [to strike] into their heads." Ex. B. ¶¶ 19–32. In the first session, Ms. Soares de Oliveira dos Santos was already crying and upset because an immigration judge had just denied her request to override ICE's decision and release her. *Id.* ¶¶ 18–19. Despite Ms. Soares de Oliveira dos Santos's emotional state, four GEO employees, including a supervisor, proceeded to interrogate and lecture her about the hunger strike, asking about who had "put the idea into [their] heads." *Id.* Ms. Soares de Oliveira dos Santos was released for twenty minutes, then ordered back to the medical area again and interrogated in an even more aggressive manner. *Id.* ¶¶ 21–22. Ms. Soares de Oliveira dos Santos told them, truthfully, that there was no "leader" of their strike, but the employees repeatedly threatened to lock Ms. Soares de Oliveira dos Santos in an isolation room and keep her there until she told them who the leader was. *Id.*

They eventually locked her into isolation, where she remained, terrified, for an hour until multiple ICE officers entered and interrogated her, yet more aggressively than the GEO employees had. *Id.* ¶¶ 23–39. One of the ICE officers said directly that ICE would take her daughter to another detention center if she went on with the strike. *Id.* ¶ 30. The officer leaned close to her, tapped his index finger on his temple, raised his voice and said "do you know what

I'm saying?" *Id.* Defendants used her daughter as leverage, asking Ms. Soares de Oliveira dos Santos to consider how her daughter would feel if she were locked inside the isolation room. *Id.*

All three of the striking mothers whom ICE and GEO locked away terrified by this experience. Ex. A. ¶¶ 21, 23–24, 27, 30, 32–33; Ex. B. ¶¶ 22, 24, 26–31; Ex. C ¶¶ 18, 20, 25. Many other mothers dropped out of the strike when they realized that ICE and GEO were willing to lock their children in isolation . Ex. B. ¶ 39; Ex. C ¶ 30; Ex. D ¶¶ 30–31.

### 3. ICE Officials and GEO Employees Continued Retaliating Throughout the Strike

ICE officials and GEO employees carried out many other retaliatory acts during the first week of the hunger strike. Ex. A ¶¶ 35–46; Ex. B ¶¶ 39–45; Ex. C ¶¶ 31–37; Ex. D ¶ 32–37. They fired all striking mothers with job assignments at the detention center because of their participation in the strike. Ex. A ¶¶ 37–39; Ex. B ¶¶ 59–61; Ex. D ¶¶ 32–34. Many women stopped protesting and left the hunger strike, rather than lose their jobs, because they needed money to buy food their children would actually eat. Ex. A ¶¶ 37–39; Ex. B ¶¶ 59–61; Ex. D ¶¶ 32–34. Children refuse to eat the poorly prepared, undercooked food GEO serves in the dining hall—some children at Karnes have lost weight. Ex. A ¶¶ 37–39; Ex. B ¶¶ 59–61; Ex. D ¶¶ 32–34. Taking away the striking mothers' jobs was like forcing them to choose between protesting and caring for their children. Ex. A ¶¶ 37–39; Ex. B ¶¶ 59–61; Ex. D ¶¶ 32–34. Defendants told some striking mothers that they would be deported if they continued participating in the strike. Ex. A ¶¶ 18, 57; Ex. B ¶ 41, 67. Because ICE and GEO have such a close relationship, many women took this threat seriously and feared that their strike would result in deportation to the violence they had already tried so hard to escape. Ex. B ¶ 41. Striking mothers also had trouble with email access, telephone access, and buying food for their children at the commissary. Ex. A ¶ 41–42; Ex. B ¶ 42; Ex. C ¶¶ 32–33. GEO guards refused to allow a nun to visit with a hunger

striker on Good Friday.  Ex. A ¶ 43.  GEO guards interrogated at least one striking mother about her visit with a friend of Ms. De Leon from RAICES.  Ex. D ¶ 36.

In the aggregate, this pattern of harassment meant that participating in the strike carried a risk of deportation, isolation, interrogation, intimidation, interference with the well-being of striking mothers' children, and interference with communication with attorneys and family members.  Ex. A ¶¶ 35–46; Ex. B ¶¶ 39–45; Ex. C ¶¶ 31–37; Ex. D ¶ 32–37.  The harassment had its intended effect.  By the end of the week, as a result of ICE and GEO's retaliatory actions, less than twenty women were still protesting.  Ex. A ¶¶ 35–46; Ex. B ¶¶ 39–45; Ex. C ¶¶ 31–37; Ex. D ¶ 32–37.

> **4.**    **ICE Officials and GEO Employees Falsified Charges of Insurrection Against Hunger Strikers**

ICE officials instructed GEO employees to discipline striking mothers, resulting in falsification of a charge that striking mothers committed "insurrection" and attempted to escape by flagging down a helicopter.  Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44.  On Wednesday, April 1, GEO guards were harassing the mothers by videotaping them with handheld cameras.  Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44.  The guards were standing in the same area as the striking mothers, standing close by and invasively taping the mothers and their children in order to show that there was no hunger strike at Karnes.  Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44.  The striking mothers decided to show the truth, that they were protesting, by writing on eight sheets of printer paper and holding them up to spell "L-I-B-E-R-T-A-D," which means freedom in Spanish.  Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44.  GEO guards ordered the mothers into their rooms before their recreation time had ended.  Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44.  The mothers discussed the issue with the guards for a few minutes, then went to their dorms.  Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44.  That

night, the GEO guards kept everyone in the facility on lockdown during the normal hours for recreation. Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44.

The next morning, at the instruction of an ICE official, a GEO guard charged some of the striking mothers who had held the "L-I-B-E-R-T-A-D" sign with committing "insurrection." Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44. The charge stated that the mothers were "waiting on a helicopter to come to the facility" and that the helicopter had an "uncertain motive," suggesting that the mothers had attempted to signal the helicopter or escape. Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44; Ex. N. The charge also specified that the mothers were ordered to return to their rooms "[d]ue to the blatant protesting." Ex N. The GEO guard instructed the striking mothers to sign the disciplinary charge and admit their guilt, lest they have to answer to ICE. Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44.

### D.   ICE and GEO's Actions Continue to Chill Participation in the Hunger Strike

The striking mothers suspended their strike on Saturday, April 4, 2015, to give ICE ten days to consider their demands. Ex. A ¶ 51; Ex. B ¶ 58; Ex. C ¶ 46; Ex. D ¶¶ 46–47. ICE did not formally respond, and the hunger strike resumed on April 14, 2015. Ex. A ¶ 51; Ex. B ¶ 58; Ex. C ¶ 46; Ex. D ¶¶ 46–47.

While the chilling effect of ICE and GEO's prior conduct persists, ICE and GEO also actively continue to retaliate against hunger strikers. Defendants weigh the striking mothers every day, even when their strike is suspended. Ex. A ¶ 52; Ex. B ¶ 62; Ex. C ¶ 51; Ex. D ¶ 48; Ex. S (Apr. 24, 2015 Decl. of Polyane Soares de Oliveira dos Santos) ¶ 6. GEO staff wake some mothers unnecessarily early to perform the weigh-in. Ex. S ¶ 6. If a mother refuses for just one day, GEO staff endlessly pesters her in her room, telling her she must go to the medical area to be weighed. Ex. A ¶ 52. If she agrees to be weighed, GEO staff who perform the weigh-in urge

her to stop striking or else her children will be taken away. Ex. A ¶ 52; Ex. B ¶ 62; Ex. C ¶ 51; Ex. D ¶ 48.   The staff performing the weigh-in occasionally threaten to lock the mother in isolation if she continues her strike.   Ex. A ¶ 52; Ex. B ¶ 62.   During one weigh-in, GEO staff falsely claimed that Ms. Pineda Cruz had a fever, and pressured her sign a paper written in English, which she cannot read.   Ex. A ¶ 52.   She believes that GEO staff were attempting to lock her into isolation by claiming that she has a contagious disease.   *Id.*   GEO has been disciplining striking mothers for trivial offenses, such as wearing shower sandals in the outdoor area while their tennis shoes are being washed.   Ex. S ¶ 7, Ex. T (Apr. 24, 2015 Decl. of Lilian Castillo Rosado) ¶ 13.   GEO has also continued to interfere with Ms. Pineda Cruz's ability to communicate with counsel via email.   Ex. R ¶¶ 14–15.

After firing all mothers who refused to abandon their strike, GEO raised the prices in the commissary, which is the only food the striking mothers' children will eat.   Ex. B ¶ 61; Ex. S ¶¶ 2–3; Ex. T ¶¶ 1–4.   The combination of lost jobs and increased prices has made it very difficult for striking mothers to keep their children well-fed.   Ex. B ¶ 61; Ex. S ¶¶ 2–3; Ex. T ¶¶ 1–4.   Even if the striking mothers wanted to try to force their children to eat the undercooked food, they are unable to do so without compromising their strike.   ICE and GEO will not permit children to enter the dining hall alone, so if a mother does not have money to buy food from the commissary, she must enter the dining hall in order to feed her children.   Ex. S ¶¶ 3–4; Ex. T ¶¶ 1–4.   GEO employees use a video camera and a written list to keep track of all the striking mothers who enter the dining hall, and later, based on that list, claim that there is no hunger strike at all.   Ex. S ¶ 4, Ex. T ¶¶ 1–4.

During a media visit, ICE and GEO confined the striking mothers to keep them away from the press.   Each of the striking mothers (except Ms. Pineda Cruz) was told that she had a

court appearance and required to report to the room in which mothers have videoconferences with the immigration court.  Ex. R (Apr. 24, 2015 Decl. of Delmy Pineda Cruz) ¶ 3; Ex. S ¶¶ 9–13; Ex. T ¶¶ 6–10.  Many of the striking mothers believed that ICE had finally decided to release them.  Ex. R ¶ 3; Ex. S ¶¶ 9–13; Ex. T ¶¶ 6–10.  Instead, an ICE official named Norma held the women in the room until an ICE official told her that the "visitors" had left, at which point Norma promptly released the striking mothers.  Ex. S ¶¶ 9–13; Ex. T ¶¶ 6–10.  Many GEO officials smirked at the women as they came out, and at least one mocked a striking mother for believing she might have been released.  Ex. S ¶¶ 9–13; Ex. T ¶¶ 9–10.

During the media visit, Ms. Pineda Cruz was initially permitted to remain in the outdoor area, where she saw the media and approached them to speak with them.  Ex. R ¶¶ 4–7.  Three ICE officials physically blocked Ms. Pineda Cruz from speaking to the media, and one official grabbed her by the arm, warning that she had gotten herself into trouble.  *Id.*  ICE and GEO officials then confined Ms. Pineda Cruz to her dormitory for fifteen to twenty minutes.  *Id.* ¶¶ 8–11.  A line of officials stood with their backs to her dormitory room, blocking the windows and the door, so Ms. Pineda Cruz could not escape and the media could not see her waving for help through the window.  *Id.*

ICE and GEO have also failed to respect the named Plaintiffs' attorney/client relationship with respect to this lawsuit.  Defendant Juanita Hester required the striking mothers, including the named Plaintiffs, to sign statements about the strike and endure lectures about the strike after it became apparent that the named Plaintiffs may have retained counsel to represent them in this matter.  Ex. Q (Decl. of Trisha Trigilio) ¶¶ 6, 14–15.  Ms. Hester required the striking mothers to attend a meeting immediately prior to a scheduled attorney visit on Monday, April 20, 2015.  Ex. A ¶¶ 55–59; Ex. B ¶¶ 65–68; Ex. D ¶¶ 50–55; Ex. Q ¶ 11–12, 15.  At the meeting, ICE and GEO

forced the striking mothers to write statements about the purpose of the strike and listen to a lecture about how the strike will not work.  Ex. A ¶¶ 55–59; Ex. B ¶¶ 65–68; Ex. D ¶¶ 50–55; Ex. Q ¶¶ 6, 14–15.  ICE then threatened to separate the striking mothers from their children.  Ex. A ¶¶ 55–59; Ex. B ¶¶ 65–68; Ex. D ¶¶ 50–55.

As a result of this meeting, the loss of their jobs, and the increased prices in the commissary, on top of ICE and GEO's initial retaliatory acts, the mothers again suspended their strike on Tuesday, April 21, 2015.  Ex. R ¶ 1; Ex. S ¶¶ 1–2; Ex. T ¶¶ 1–4.

The named Plaintiffs will continue peaceful protests, including a hunger strike, despite ICE and GEO's consistent harassment and threats.  Ex. R ¶ 1; Ex. S ¶¶ 1–2, 5; Ex. T ¶¶ 5, 10. ICE and GEO's retaliatory acts deterred more than sixty other mothers from participating in any protest activity, and their injury continues.  Ex. A ¶ 53; Ex. B ¶ 63; Ex. D ¶ 49; Ex. E.

## II.    Legal Standard

A preliminary injunction is a remedy for a plaintiff who faces irreparable injury before the court can enter judgment on the merits of her claim.  Wright & Miller, 11A Fed. Prac. & Proc. Civ. 3d § 2947.  To protect a plaintiff from irreparable injury during pending litigation, a court may enter a preliminary injunction upon finding a (1) substantial likelihood of the plaintiff's success on the merits, (2) a substantial likelihood that the plaintiff will suffer irreparable harm, (3) that the harm to the plaintiff outweighs the cost of the injunction, and (4) that the injunction "does not disserve the public interest." *Jackson Women's Health Org. Ctr.*, 760 F.3d 448, 452 (5th Cir. 2014) (quoting *Hoover v. Morales*, 164 F.3d 221, 224 (5th Cir. 1998)).  Moreover, to prevent irreparable injury before a preliminary injunction hearing, a court may enter a temporary restraining order without waiting for the defendants to be heard.  Fed. R. Civ. P. 65(b); Wright & Miller § 2951 (describing temporary restraining orders entered on notice

16

to the defendants, but without waiting for the defendants to be heard).  A court may issue a TRO if the plaintiff files an affidavit specifying reasons she faces immediate and irreparable injury, and plaintiff's counsel certifies reasons why the court should not require further delay to notify or hear the defendant.  Fed. R. Civ. P. 65(b).

As courts regularly observe, a preliminary injunction is an "extraordinary" remedy. *Jackson Women's Health Org. Ctr.*, 760 F.3d at 452.  But that observation cannot "take the place of a sound evaluation of the factors relevant to granting relief."  Wright & Miller § 2947.  The overarching question is whether the probability of ultimate success on the merits outweighs the consequences of court intervention at an early stage.  *Texas v. United States*, __ F. Supp. 3d __, 2015 WL 648579 , *37 (S.D. Tex. Feb. 16, 2015) (quoting *Meis v. Sanitas Serv. Corp.*, 511 F.2d 655, 656 (5th Cir. 1975)).

Critically, because the plaintiff has not had an opportunity for discovery and trial preparation, she is not required to demonstrate a certainty of success on the merits.  *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (emphasizing that a plaintiff "is not required to prove his case in full at a preliminary injunction hearing"); *see also Texas v. United States*, 2015 WL 648579 at *36 (holding that "the plaintiff 'need not prove his case'" to obtain preliminary injunctive relief) (quoting *Lakedreams v. Taylor*, 932 F.2d 1103, 1109 n.11 (5th Cir. 1991)).  The plaintiff must present a prima facie case, but she "need not show a certainty of winning."  *Texas v. United States*, 2015 WL 648579 at *36 (quoting Wright & Miller § 2948.3).

## III.    Argument

### A.    Plaintiffs Are Substantially Likely to Succeed on the Merits

Plaintiffs are substantially likely to prevail on the merits of their First Amendment retaliation claim.  In addition to prohibiting direct restrictions on speech, belief, and association,

the First Amendment prohibits adverse government action in retaliation for exercise of those freedoms. *Izen v. Catalina*, 398 F.3d 363, 367 (5th Cir. 2005) (quoting *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999)). This is because, by penalizing speech, belief, or association, the government "chills the exercise of First Amendment freedoms and thereby indirectly produces a result that the government cannot command directly." *Colson*, 174 F.3d at 509 (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). By taking adverse action against people who choose to speak out, the government effectively penalizes and inhibits speech, which is exactly what the First Amendment is designed to forbid. *Id.* at 509–10 (quoting *Perry*, 408 U.S. at 597).

To prove retaliation, a plaintiff must show that she was engaged in activity protected by the First Amendment, that the defendant injured the plaintiff in a way that would deter a person of ordinary firmness from continuing the protected activity, and that the defendant's actions were substantially motivated against the plaintiff's protected activity. *Izen*, 398 F.3d at 367.

As explained below, Plaintiffs engaged in speech and expressive conduct protected by the First Amendment when they circulated a petition seeking release from their discretionary detention and then engaged in a hunger strike. ICE and GEO's pattern of harassment in response to the Plaintiffs' activity, including locking the perceived leaders of the strike into isolation with their children and threatening to separate striking mothers from their children, made most of the protesting mothers think twice about continuing to speak out. ICE and GEO took those actions for the purpose of deterring further written petitions and ending the hunger strike.

### 1. The Petition and Hunger Strike Are Expressive Conduct at the Heart of First Amendment Protection

The First Amendment protects speech and other "inherently expressive" conduct. *Voting for Am., Inc. v. Steen*, 732 F.3d 382, 388 (5th Cir. 2013) (citing *Rumsfeld v. Forum for Academic & Inst'l Rights, Inc.*, 547 U.S. 47, 66 (2006)). The written word is presumptively protected by

the First Amendment.  *See United States v. Johnson*, 559 U.S. 460, 468–472 (2010) (describing strictly limited categories of speech that are unprotected).  To determine whether conduct entails sufficient "communicative elements" to be an inherently expressive, protected act, courts consider whether the conduct demonstrates an "intent to convey a particular message" and whether "the likelihood was great that the message would be understood by those who viewed it."  *Voting for Am., Inc. v. Steen*, 732 F.3d at 388 (quoting *Texas v. Johnson*, 491 U.S. 397, 404 (1989) (quotation marks and citation omitted)).

Expression for the purpose of bringing about social and political change is at the heart of expression the First Amendment is intended to protect.  *Lane v. Franks*, 134 S.Ct. 2369, 2377 (2014).  The First Amendment is a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."  *Snyder v. Phelps*, 131 S.Ct. 1207, 1215 (2010) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).  Speech about government action "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection."  *See id.* (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)).

The Fifth Circuit has explicitly recognized that "a hunger strike may be protected by the First Amendment if it was intended to convey a particularized message."  *Stefanoff v. Hays Cnty.*, 154 F.3d 523, 527 (5th Cir. 1998) (per curiam).  Hunger strikes are widely recognized as a deep personal sacrifice to protest an injustice.  Justice Brennan recognized hunger strikes as a "special form of political communication" that "conveys an emotional message that is absent in

. . . even a protest march." *F.T.C. v. Sup. Ct. Trial Lawyers Ass'n*, 493 U.S. 411, 450–51 (1990) (Brennan, J., dissenting).[3]

The petition and hunger strike at issue here are emblematic of the type of expressive conduct protected by the First Amendment. As a written document expressing the mothers' desire for release from detention, the petition is presumptively protected by the First Amendment. *See Johnson*, 559 U.S. at 468–472 (describing narrow categories of speech that are unprotected). The hunger strike itself is also expressive conduct protected by the First Amendment. The Plaintiffs' intended message is clear and unmistakable: they are protesting the government's decision to detain them and their children, unnecessarily, for political ends. Ex. A ¶¶ 3–5, 9–10, 12; Ex. B ¶¶ 3–5, 11–12, 14; Ex. C ¶¶ 4–5; Ex. D ¶¶ 2–6, 15–17; Ex. E at 13 ("We came to this country with our children in search of protection and we are treated like criminals and we are not that at all, much less are we a danger to this country. . . . We have this right to migrate to freedom with our children."). They are also protesting the conditions that their children must endure at Karnes. Ex. A ¶¶ 3–10, 12; Ex. B ¶¶ 3–12, 14, 14; Ex. C ¶¶ 4–5; Ex. D ¶¶ 2–17; Ex. E at 13 ("Our children are living in poor conditions. Our children are not eating."). The striking mothers manifested their intent in the original petition and consistently reiterated their desire to be released throughout ICE's and GEO's interrogations. Because the petition and hunger strike both are intended to express a message, and that message very likely to be understood, the hunger strike is expressive conduct protected by the First Amendment. *See Voting for Am., Inc.*, 732 F.3d at 388 (outlining these criteria for expressive conduct); *Stefanoff*, 154 F.3d at 527 (discussing hunger strikes conveying a particular message).

---

[3] Justice Brennan further observed: "By sacrificing [what] that they actually desired, and thus inflicting hardship on themselves . . . [boycott participants] demonstrated the intensity of their feelings and the depth of their commitment. The passive nonviolence of King and Gandhi are proof that the resolute acceptance of pain may communicate dedication and righteousness more eloquently than mere words ever could." 493 U.S. at 450.

This analysis is unaffected by the fact that Plaintiffs are noncitizens. Noncitizens in the United States enjoy freedom of speech. *Bridges v. Wixon*, 326 U.S. 135, 148 (1945). While noncitizens may under some circumstances be deported or excluded from the United States on the basis of what would otherwise be protected speech, *see, e.g.*, *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999), courts respect noncitizens' First Amendment protections outside of this context. *See generally* Maryam Kamali Miyamoto, *The First Amendmnent After Reno v. American-Arab Anti-Discrimination Committee*, 35 HARV. C.R.-C.L. L. REV. 183, 193–94 (2000) (cataloging cases involving the First Amendment rights of noncitizens). The exception for deportation and exclusion rests solely on the basis of Congress's plenary power to exclude or expel noncitizens. *See Kleindienst v. Mandel*, 408 U.S. 753, 768–70 (1972) (holding limited First Amendment enforcement for noncitizen seeking admission was premised entirely on Congress's plenary power); Miyamoto at 198–99. Where Congress's plenary power does not apply, there is no justification to limit a noncitizen's rights under the First Amendment. *Bridges*, 326 U.S. at 148. *See, e.g.*, *Schneiderman v. United States*, 320 U.S. 118 (1943) (holding government cannot deny naturalization on the basis of protected speech); *Brunnenkant v. Laird*, 360 F. Supp. 1330, 1331 (D.D.C. 1973) (reinstating noncitizen's security clearance that had been withdrawn because of protected speech).

Here, Plaintiffs' claim is not that the government is impermissibly deporting or excluding them on the basis of protected speech. Rather, the Plaintiffs' claim is that government agents are impermissibly threatening to take away their children, lock them in isolation, and carry out other retaliatory acts on the basis of protected speech. The Plaintiffs' claim does not implicate Congress's plenary power to exclude or expel noncitizens, and therefore, the fact that the Plaintiffs are noncitizens is irrelevant to their First Amendment rights.

### 2.    ICE and GEO's Actions and Threats Would Deter a Person of Ordinary Firmness from Continuing Her Strike

Retaliatory action violates First Amendment rights if the action is capable of deterring a "person of ordinary firmness" from further exercise of her rights. *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006); *Keenan v. Tejada*, 290 F.3d 252, 259 (5th Cir. 2002). This threshold "is intended to weed out only inconsequential actions and is not a means to excuse more serious retaliatory acts." *Morris*, 449 F.3d at 686. Confinement in isolation is certainly not inconsequential. Even in the prison context, where courts sanction more intrusive limitations on prisoners' civil liberties, the Fifth Circuit has held that placement in segregation is sufficiently serious to constitute retaliation, *Cruz v. Beto*, 603 F.2d 1178, 1185–86 (5th Cir. 1979), as is a punishment of commissary and cell restrictions for twenty-seven days, *Hart v. Hairston*, 343 F.3d 762, 764 (5th Cir. 2003).[4]

Threats, as well as actions, must be considered to determine the deterrent effect of the defendant's retaliation. The Fifth Circuit has held that "even a *threat*[] . . . can be a potent means of chilling the exercise of constitutional rights." *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968)); *accord Izen*, 398 F.3d at 367 n.5 (discussing "threat[]" as retaliation). The question is the same for threats as for adverse action: whether the threat would deter a person of ordinary firmness. *Keenan*, 290 F.3d at 259 (discussing officers detaining plaintiffs for an "inordinate period of time" with guns drawn;

---

[4] First Amendment cases litigated in the prison context are not directly applicable to this case. In light of a prisoner's criminal conviction and sentence to imprisonment, prisons may place reasonable limitations on her civil liberties. *Turner v. Safley*, 482 U.S. 78 (1987). Plaintiffs, however, have not been convicted of a crime, nor even charged with a crime. They and their children are in civil immigration detention, which is entirely nonpunitive. *Zadvydas v. Davis*, 533 U.S. 678, 690–696 (discussing "important constitutional limitations" on immigration detention, which is appropriate only under "special and narrow nonpunitive circumstances") (quotation marks and citations omitted).

asking "whether a person of ordinary firmness would have been deterred by these ominous events").[5]

The deterrent effect of defendants' actions should be considered in the aggregate because a person who exercises her First Amendment rights does not encounter the defendant's retaliatory acts piecemeal. To understand the actual deterrent effect of the defendant's acts, the Court must consider how an ordinary person would react to the defendant's entire course of conduct. *See Breaux v. City of Garland*, 205 F.3d 150, 160 (5th Cir. 2000) (discussing claims based on actions in the aggregate and a "campaign of retaliatory harassment"). *See also Bennett v. Hendrix*, 423 F.3d 1247, 1254–55 (11th Cir. 2005) ("[R]eadily conclud[ing]" that campaign of harassment by police officers was sufficient); *Wallace v. Benware*, 67 F.3d 655, 663 (7th Cir. 1995) (upholding liability for "campaign of petty harassment"); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (Posner, J.) (sustaining claim about "an entire campaign of harassment which though trivial in detail may have been substantial in gross"). Even if "the [deterrent] effect on freedom of speech is small, since there is no justification for harassing people exercising their constitutional rights[,] it need not be great in order to be actionable." *Bart*, 677 F.2d at 625 (Posner, J.); *see also Keenan*, 290 F.3d at 259 (quoting the same).

---

[5] Other circuits agree that threats by themselves are sufficient to violate the First Amendment if they would deter a person of ordinary firmness. *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011) (holding First Amendment violation may result "where the defendant's speech is threatening, harassing, or intimidating"); *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (asking whether "threat is capable of deterring a person of ordinary firmness"); *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (asking whether statements can be interpreted as "intimating that some form of punishment or adverse regulatory action would follow"); *Suarez Corp. Inds. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000) (discussing "threat[s], coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow"); *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000) (considering threats); *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992) ("[T]he threat of discipline implicit in [the defendant's] actions was sufficient to create a judicially cognizable chilling effect").

In this case, there are at least three reasons to conclude that ICE and GEO's sustained threats and harassment of the striking mothers would deter a person of ordinary firmness from continuing with her strike.  First, the hunger strikers at Karnes are mothers, and they face the impossible task of caring for and nurturing their children in a secure detention facility.  The majority of ICE and GEO's tactics—firing striking mothers from their jobs; Ex. A ¶¶ 37–39; Ex. B ¶¶ 59–61; Ex. D ¶¶ 32–34; invasively videotaping children; Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44; raising prices at the commissary; Ex. B ¶ 61; Ex. S ¶ 2; Ex. T ¶ 2; and threatening to lock children in isolation with their mothers; Ex. B. ¶ 39; Ex. C ¶ 30; Ex. D ¶¶ 30–31—have the effect of interfering with the striking mothers' ability to care for their children inside Karnes.  A person of ordinary firmness would feel deterred by losing the few comforts she could provide to her child during prolonged detention in a prison-like setting.

Second, declarations from the three named Plaintiffs and Ms. Yakeline Galeano demonstrate that even the most resolute striking mothers felt deterred by ICE and GEO's actions.  Two striking mothers were terrified when their children were locked into an isolation cell with them overnight.  Ex. A ¶¶ 21, 23, 24, 27, 30, 32–33; Ex. C ¶¶ 15, 18, 20, 25.  A third striking mother was terrified by repeated interrogations, confinement in isolation, and threats to confine her daughter in the same way.  Ex. B ¶¶ 24, 26–31.  Other striking mothers were so scared of this tactic that they dropped out of the strike completely when they learned that children and their mothers were being locked away.  Ex. B. ¶ 39; Ex. C ¶ 30; Ex. D ¶¶ 30–31.  Ms. Castillo Rosado—who was not yet locked in isolation—felt deterred by the threat that, if she continued with the strike, ICE and GEO could lock her away as well.  Ex. D ¶¶ 30–31.  On top of the fear that their children would be confined in isolation rooms, the striking mothers were also afraid that ICE and GEO would claim the mothers had a mental illness and send their children to

another detention facility.  Ex. A ¶ 19; Ex. B ¶ 36; Ex. C ¶ 20; Ex. D ¶ 27.  For the most resolute mothers who have continued with their strike, ICE and GEO have maintained a campaign of harassment, including daily weigh-ins at early hours, false and misleading claims about required court appearances, confinement away from the press, job revocations and price hikes, intrusive videotaping, interference with telephone and email access, denial of visitors, selective disciplinary charges, false charges of insurrection, warnings of further punishment for striking, and threats of deportation.  Ex. A ¶¶ 35–43, 51–59; Ex. B ¶¶ 41–55, 58–68; Ex. C ¶¶ 31–34, 36–46, 48–49, 51; Ex. R ¶¶ 3–15, 18; Ex. S ¶¶ 1–18; Ex. T ¶¶ 1–13.  The named Plaintiffs report that these tactics make them and other striking mothers second-guess their decision to protest.  Ex. A ¶¶ 35–43, 51–59; Ex. B ¶¶ 41–55, 58–68; Ex. C ¶¶ 31–34, 36–46, 48–49, 51; Ex. R ¶¶ 3–15, 18; Ex. S ¶¶ 1–18; Ex. T ¶¶ 1–13.

Third, the number of hunger strikers has dropped from nearly eighty to much less than twenty.  Ex. A ¶¶ 35–46; Ex. B ¶¶ 39–45; Ex. C ¶¶ 31–37; Ex. D ¶ 32–37.  The plaintiffs have observed this to be a direct result of ICE and GEO's pattern of threats and harassment.  Ex. A ¶¶ 35–46; Ex. B ¶¶ 39–45; Ex. C ¶¶ 31–37; Ex. D ¶ 32–37; Ex. R ¶ 1; Ex. S ¶¶ 1–2, 5; Ex. T ¶¶ 1–5.  As has been demonstrated by the precipitous drop in hunger strikers over the last three weeks at Karnes, an ordinary person would feel deterred by these tactics.

### 3. ICE and GEO's Threats Are Substantially Motivated by Deterring the Hunger Strikers

A defendant's actions are "substantially motivated against" protected First Amendment activity if the actions are intended to deter further expression.  It is irrelevant whether there is a conceivable justification for the defendant's actions: "An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate."  *Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir.

1995).   The question is whether the actual motivation for the government's actions was retaliatory.  *Id.*

In this case, the motive for threatening to transfer the hunger strikers' children to another facility is retaliatory.  ICE and GEO purport to make these threats on the basis of a concern over whether the striking mothers are competent to care for their children.  This pretext for threatening the hunger strikers is unpersuasive for many reasons.

First, ICE and GEO started threatening to send the striking mothers' children away within hours of the beginning of the strike, before there was even arguable danger.  Ex. A ¶¶ 16–19; Ex. B ¶¶ 33–38; Ex. C ¶¶ 8–11; Ex. D ¶¶ 23–28.   The hunger strikers had missed, at most, two meals.  There was no question that the strikers were still able to care for their children. Second, ICE and GEO consistently tell striking mothers that they *will* become unfit to care for their children if they continue their hunger strike, and for that reason, their children *will* be taken away.  Ex. A ¶¶ 16–19, 52, 55–59; Ex. B ¶¶ 33–38, 62, 65–68; Ex. C ¶¶ 8–11; Ex. D ¶¶ 23–28, 48, 50–55.   The threat implies a foregone conclusion that ICE will take children away if the mothers continue with their strike, not in virtue of a striking mother's actual health problems that may or may not develop.  Given that these threats were made within hours of the first time the striking mothers refused a meal, they were clearly intended to deter the mothers from continuing their strike.

Third, ICE and GEO also said that if they did separate children from their mothers, ICE would refuse to release the children to other family members in the United States.  Instead, the children would be sent to another detention facility. Ex. D ¶ 28.  This threatened course of conduct is either a bluff or a blatant violation of ICE's obligations under a settlement agreement

requiring release of unaccompanied minor children.[6]  In either case, this threat is clearly intended to deter the striking mothers.

Fourth, ICE and GEO deliver their threat in the context of mandatory meetings, in which the striking mothers are forced to explain themselves before multiple ICE officials and then listen to the officials argue that the strike will not work. ICE and GEO have repeated their threat ad nauseam at multiple mandatory meetings with the striking mothers and at daily weigh-ins. Ex. A ¶ 16–19, 52, 55–59; Ex. B ¶¶ 33–38 62, 65–68; Ex. C ¶¶ 8–11, 51; Ex. D ¶¶ 23–28, 48, 50–55.  These threats are not a friendly heads-up about potential long-term consequences of a hunger strike.  They are a constant message that ICE and GEO have the power to devastate these women by taking away their children.

In short, ICE and GEO's threats to separate striking mothers from their children are substantially motivated by a desire to end the hunger strike.  In addition to these threats, ICE and GEO have taken many other actions that are motivated substantially or completely by a desire to end the strike.

First, ICE and GEO have threatened striking mothers with other legal consequences of their continued protests.  Defendants have told striking mothers that they would be deported or, more obliquely, that they would have "problems with ICE."  Ex. A ¶¶ 18, 40, 57; Ex. B ¶¶ 41, 67; Ex. C ¶ 46; Ex. S ¶ 8.  This threat should be considered in context with ICE and GEO's repeated demands for written statements and signatures on documents the striking mothers cannot read.  Ex. A ¶¶ 40, 52, 55; Ex. B ¶ 65; Ex. C ¶¶ 14–15, 46; Ex. D ¶¶ 35–36, 53.  The

---

[6] The settlement agreement requires ICE to place children in the least restrictive possible setting, and it generally requires ICE to release children to other relatives if they cannot be placed with their parents.  *Flores v. Reno*, CV 85-4544-RJK (C.D. Cal. Jan. 17, 1997), *available a*t https://www.aclu.org/sites/default/files/pdfs/immigrants/flores_v_ meese_agreement.pdf.  When a child is held in ICE custody, the settlement agreement requires detention in facilities that are not secure (or locked down, like Karnes) and that are licensed by the state for purposes of the care of dependent children.  None of ICE's secure detention centers meet these requirements.

striking mothers have no idea where those papers are going or how their asylum cases might be affected.   ICE and GEO know the purpose of the strike; their repeated requests for written statements and signed documents are an intimidation tactic, meant to force the mothers to worry where these written statements will be sent.   Moreover, with respect to the three named Plaintiffs, ICE and GEO have failed to respect the attorney/client relationship between the named Plaintiffs and counsel for this suit.   Defendant Juanita Hester arranged a mandatory meeting with the striking mothers immediately prior to a scheduled attorney visit, forcing the striking mothers to write statements about the purpose of the strike and listen to repeated threats to separate the mothers from their children.   Ex. A ¶¶ 55–59; Ex. B ¶¶ 65–68; Ex. D ¶¶ 50–55; Ex. Q ¶¶ 6, 14–15.   There is no legitimate justification for misleading striking mothers about the legal consequences of their protest.

Second, ICE and GEO have deterred the striking mothers by punishing the mothers perceived to be the leaders of the strike.   An ICE official and a GEO guard explicitly told Ms. Pineda Cruz and Ms. Yakeline Galeano, respectively, that they were locked in isolation to punish them because ICE thought they were leaders of the strike.   Ex. A ¶ 44, Ex. C ¶ 21.   GEO staff have used the fact that these striking women were locked up as a tool to threaten, telling strikers at weigh-ins that the GEO staff "don't want to have to lock [you] up."   Ex. A ¶ 52; Ex. B ¶ 62. There is no legitimate justification for punishing striking mothers by confining their children with them in isolation cells.

Third, GEO fired hunger strikers from their jobs en masse on the sole basis of their participation in the strike.   Ex. A ¶¶ 37–39; Ex. B ¶¶ 59–61; Ex. D ¶¶ 32–34.   At the same time, GEO raised prices in the commissary, where striking mothers purchase food to feed their children because they refuse to eat the food served at Karnes.   Ex. B ¶ 61; Ex. S ¶¶ 2–4; Ex. T ¶¶

1–5.  Defendants had no legitimate justification for depriving mothers of the only reliable means by which they can keep their children well-fed.

Fourth, ICE and GEO falsely charged hunger strikers with insurrection, then threatened them with negative immigration consequences if they did not sign papers indicating that they were guilty of the falsified charges.  Ex. B ¶¶ 46–55; Ex. C ¶¶ 38–46; Ex. D ¶¶ 38–44.  This, too, lacked any legitimate justification.

These are just the most egregious examples from a lengthy campaign of intimidation ICE and GEO have instituted against the hunger strikers.  Defendants had no legitimate justification for these actions.[7]  ICE and GEO would not be taking any of these actions if women simply refused meals without explaining why.  ICE and GEO would not be taking any of these actions in the absence of a hunger strike.

### 4.    GEO's Actions Are Government Actions

Although GEO is a private company, its actions retaliating against Plaintiffs and other protesting mothers at Karnes amount to government action for purposes of the retaliation claim. The actions of private entities can be regarded as government action for First Amendment purposes.  *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378 (1995); *San Francisco Arts*

---

[7] *Turner v. Safley*, 482 U.S. 78 (1987), provides no cover for ICE or GEO.  That case held that prison regulations may impinge on prisoners' constitutional rights if they are reasonably related to legitimate penological interests.  Immigration detainees such as Plaintiffs have not been convicted of any crime, their detention is not punitive, and no penological purpose applies. *Zadvydas*, 533 U.S. at 690–96. Plaintiffs are unaware of any decision by the Supreme Court of the Fifth Circuit holding that *Turner* applies to civil detention.

Even if *Turner* applied, it would not justify Defendant's conduct.  As explained above, Defendants have no legitimate purpose for their retaliatory actions.  Their motive is to inhibit First Amendment speech.  Moreover, *Turner* held that a prison's regulation is invalid if there are "obvious, easy" alternatives to the regulation, demonstrating that the prison has had an exaggerated response to its concerns.  482 U.S. at 90.  Here, the obvious, easy alternative is for Defendants to refrain from isolating and firing protesting mothers, and to cease threatening mothers with child separation unless they are, in fact, at imminent risk of losing their children.

*& Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 546 (1987) [hereinafter *SFAA*].  The tests for determining whether private entities are state actors for purposes of 42 U.S.C. § 1983 also apply to determine whether private actors are state actors under the First Amendment.  *See Lebron*, 513 U.S. at 378 (applying standard for government action from a § 1983 case, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)); *SFAA*, 483 U.S. at 546 (applying cases including *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) (§ 1983 standard)).

GEO's retaliation against the hunger strikers constitutes government action for at least two reasons.  First, GEO is performing a fundamentally governmental function.  ICE and Karnes County have contracted with GEO to operate Karnes on behalf of ICE, which is responsible for the well-being of noncitizens who are detained pending the completion of removal proceedings.  Ex. M (Karnes Intergovernmental Service Agreement).  When the state endows private corporations with "powers or functions governmental in nature," the private corporation becomes a state actor subject to constitutional limitations.  *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 460 (5th Cir. 2003) (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)).  This test asks whether, when a private corporation takes actions alleged to be unconstitutional, the corporation was fulfilling a governmental function.  *Cornish v. Corr. Svcs. Corp.*, 402 F.3d 545, 549–50 (5th Cir. 2005).  The Fifth Circuit has held that, because confining people is "clearly" a governmental function, a private prison corporation's actions as a custodian are subject to limitations imposed by the Constitution.  *Rosborough*, 350 F.3d at 461 (per curiam); *compare Cornish*, 402 F.3d at 550 (holding prison company's actions as an employer are not governmental functions because employment is a private function, whereas confining people is a governmental function).  Here, GEO is subject to the First Amendment when acting as Plaintiffs' custodian pursuant to federal immigration law, an undoubtedly governmental function.

Second, GEO is acting on ICE's orders. When a private corporation acts pursuant to state compulsion, the private corporation is a government actor. *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170–71 (1970)). Even if GEO is a "willful participant in joint action" with ICE, *id.* (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)), or ICE is merely providing "significant encouragement" for GEO's actions, *id.* (quoting *Adickes*, 398 U.S. at 170–71), GEO is subject to the First Amendment as a government actor.  That is the case here.  ICE oversees GEO's operations at Karnes; there are ICE officials on-site, directing operations at all times.  Ex. M.  ICE sets the standards for operations at Karnes by issuing Family Residential Standards.[8] ICE and GEO employees have explicitly stated to Plaintiffs that GEO's retaliatory actions were in accordance with ICE's orders.  Ex. A ¶ 44; Ex. C ¶¶ 17, 43.  GEO generally consults with ICE before acting and defers to ICE when ICE officials are in the room. Ex. B ¶¶ 41 59; Ex. C ¶¶ 10, 42.  GEO acts as a middleman between the hunger strikers and ICE, fulfilling ICE's instructions to squash the hunger strike while ensuring ICE doesn't get its hands dirty with specific retaliatory acts.  Ex. C ¶ 33.  Whether this arrangement is framed as ICE "exert[ing] coercive power" over GEO, ICE providing "significant encouragement" to GEO, or GEO "willful[ly] participa[ting] in joint action" with ICE, the conclusion is the same: GEO is a government actor subject to the limitations of the First Amendment.  *Cornish*, 402 F.3d at 549–550.

### B.      The Chilling Effect of ICE and GEO's Threats is an Irreparable Harm

The loss of First Amendment freedoms, even for a minimal period of time, "unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod* and citing Wright & Miller, Fed. Prac. & Proc. Civ. 2d § 2948.1).  It is an abuse of discretion to

---

[8] *Available at* http://www.ice.gov/detention-standards/family-residential.

hold that a First Amendment violation is insufficiently harmful to warrant a preliminary injunction. *Palmer ex rel. Palmer v. Waxahachie Ind. Sch. Dist.*, 579 F.3d 502, 506 (5th Cir. 2009). Because ICE and GEO's conduct is violating Plaintiffs' First Amendment rights, Plaintiffs are suffering irreparable harm.

### C.       The Balance of Harms and the Public Interest Both Favor Injunctive Relief

A preliminary injunction is appropriate if the potential harm to the plaintiff outweighs the cost of the injunction, and the injunction "does not disserve the public interest." *Jackson Women's Health Org. Ctr.*, 760 F.3d 448, 452 (5th Cir. 2014). In this case, the potential harm to the Plaintiffs is continued violation of their First Amendment rights. Even a temporary violation of fundamental rights is ordinarily found to outweigh any harm to a defendant. Wright & Miller, Fed. Prac. & Proc. Civ. 3d § 2948.2 (citing, *inter alia*, *Millennium Rests. Grp., Inc. v. City of Dallas*, 181 F. Supp. 2d 659, 667 (N.D. Tex. 2001) (holding temporary denial of First Amendment rights outweighed harm of enjoining city ordinance)). The ordinary rule should apply here. Plaintiffs seek only to restrain ICE and GEO from persisting in their retaliatory threats and actions. Complying with that injunction is cost-free. Restraining Defendants from retaliation would not impose any hardship on the operation of the Karnes facility, since the protest and hunger strike have been entirely peaceful and have not disrupted the schedule of the facility in any significant way. To the extent that ICE or GEO asserts any concern about the striking mothers' health, the injunction Plaintiffs seek does not prohibit ICE or GEO from taking action to treat serious health problems. It would only order ICE and GEO to stop taking adverse action on the basis of Plaintiffs' participation in their hunger strike.

Finally, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. Ctr.*, 760 F.3d 448, 458 n.9 (5th Cir. 2014)

(citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) and upholding injunction). Injunctive relief in this case will not "disserve the public interest"; instead, it will be protecting the public interest by protecting constitutional rights.

## IV.   Conclusion

Plaintiffs respectfully request that the Court enter a preliminary injunction and a temporary restraining order as set forth in Plaintiffs' proposed order (Ex. U).

Respectfully Submitted,

By:    /S/ Trisha Trigilio
Trisha Trigilio
Texas Bar No. 24075179
Ranjana Natarajan
Texas Bar No. 24071013
THE UNIVERSITY OF TEXAS
SCHOOL OF LAW
Civil Rights Clinic
727 E. Dean Keeton Street
Austin, TX 78705
Tel: 512-232-7222
Fax: 512-232-0800
Email: ttrigilio@law.utexas.edu

Javier N. Maldonado
Texas Bar No. 00794216
Allison N. Boyle, Esq.
Texas Bar No. 24087197
LAW OFFICE OF JAVIER N. MALDONADO, PC
8918 Tesoro Dr., Ste. 575
San Antonio, TX 78217
Tel: 210-277-1603
Fax: 210-587-4001
Email: jmaldonado.law@gmail.com

Attorneys for Plaintiffs

## Certificate in Support of Temporary Restraining Order

Pursuant to Rule 65(b) of the Federal Rules of Civil Procedure, I hereby certify that I have taken the following steps to notify Defendants of this motion, and that the Court should enter temporary relief without further efforts to notify the Defendants.

1.       On Thursday, April 24, 2015, I placed phone calls to inquire about who would accept service on behalf of Defendants to the United States Attorney's Office for the Western District of Texas, the Department of Homeland Security's Office of General Counsel, and the ICE Field Office in San Antonio.  No one was able to answer my question about who would accept service on behalf of Defendants in this suit, nor could they direct me to a person who could answer my question.  There was no answer at the ICE Field Office in San Antonio.

2.       Yesterday, April 28, 2015, my cocounsel Ranjana Natarajan called John Paniszczyn, Chief of the Civil Division at the United States Attorney's Office for the Western District of Texas.  I also emailed Mr. Paniszczyn, attached a copy of the complaint, and asked if he had time to confer about Plaintiffs' motion for a temporary restraining order.  Mr. Paniszczyn later responded by email and stated that, because of the short timeframe, he could not comment on Plaintiffs' factual allegations.  With respect to the motion for a temporary restraining order and preliminary injunction, Mr. Paniszczyn referred our request to confer to Sarah Fabian of the DOJ Office of Immigration Litigation and Gary Anderson, another Assistant United States Attorney for the Western District of Texas.  Mr. Paniszczyn stated that they are tentatively assigned to this case, although cases are not formally assigned until after service of the complaint and summons.

3.       I subsequently emailed Ms. Fabian with copies of Plaintiffs' complaint, motion for leave to file a brief in excess of ten pages, and motion for a temporary restraining order and preliminary injunction.  Ms. Fabian replied, reiterating that the Defendants have not been

properly served with the summons and complaint.   Ms. Fabian opposes the motion for a temporary restraining order, opposes the motion for class certification, and takes no position on the motion for leave to file a brief in excess of ten pages.

4.      Further efforts to notify Defendants should not be required because members of the putative class will suffer irreparable harm if they cannot exercise their First Amendment rights immediately.  This is especially true with respect to expression about family detention, given that Plaintiffs and their children are directly affected by family detention, and the practice is the subject of national conversation.  Moreover, based on declarations Plaintiffs' counsel have taken from the named Plaintiffs (Exs. A, B, D, R–T), it is likely that Defendants will retaliate against the group of new detainees arriving at Karnes early this week who attempt to exercise their First Amendment rights by peacefully protesting.


Dated: April 29, 2015              By:      /S/ Trisha Trigilio
                                            Trisha Trigilio
                                            Texas Bar No. 24075179
                                            THE UNIVERSITY OF TEXAS
                                            SCHOOL OF LAW
                                            Civil Rights Clinic
                                            727 E. Dean Keeton Street
                                            Austin, TX 78705
                                            Tel: 512-232-7222
                                            Fax: 512-232-0800
                                            Email: ttrigilio@law.utexas.edu

**Exhibit List**

A.      Declaration of Delmy Pineda Cruz, dated April 20, 2015.

B.      Declaration of Polyane Soares de Oliveira dos Santos, dated April 20, 2015.

C.      Declaration of Kenia Yakeline Galeano, dated April 20, 2015.

D.      Declaration of Lilian Castillo Rosado, dated April 20, 2015.

E.      Petition for Release from Karnes and Certified Translation, dated April 20, 2015.

F.      Julia Preston, *Detention Center Presented as Deterrent to Border Crossings*, N.Y. TIMES, Dec. 16, 2014, at A18.

G.      Declaration of Luis Zayas, Ph.D., dated December 10, 2014.

H.      Letter from 168 Nongovernmental Organizations to President Obama re: NGOs United in Opposition to Family Detention in Dilley, Karnes, and Artesia (Sept. 25, 2014).

I.      BETHANY CARSON & ELEANA DIAZ, GRASSROOTS LEADERSHIP, PAYOFF: HOW CONGRESS ENSURES PRIVATE PRISON PROFIT WITH AN IMMIGRANT DETENTION QUOTA (2015).

J.      CRISTINA PARKER ET AL., GRASSROOTS LEADERSHIP & JUSTICE STRATEGIES, FOR-PROFIT FAMILY DETENTION: MEET THE PRIVATE PRISON CORPORATIONS MAKING MILLIONS BY LOCKING UP REFUGEE FAMILIES (2014).

K.      Letter from Marisa Bono, Mex. Am. Legal Def. & Educ. Fund *et al.* to Jeh Johnson, Sec'y of Homeland Sec. *et al.* re: Complaints Regarding Sexual Abuse in DHS Custody at Karnes County Residential Center (Mar. 27, 2015).

L.      RANJANA NATARAJAN ET AL., UNIV. OF TEX. SCH. OF LAW, REPORT TO INTER-AM. COMM'N ON HUMAN RIGHTS: REPORT REGARDING GRAVE RIGHTS VIOLATIONS IMPLICATED IN FAMILY IMMIGRATION DETENTION AT THE KARNES COUNTY DETENTION CENTER (2014).

M.      Inter-Governmental Service Agreement between United States Immigration & Customs Enforcement and Karnes County, Texas; along with amendment binding The GEO Group, Inc., amendment dated December 13, 2010.

N:      Incident of Prohibited Acts: Insurrection (redacted), Karnes County Residential Center, dated April 3, 2015.

O.      Declaration of Barbara Hines, dated December 15, 2014.

P.      Declaration of Johana De Leon, dated April 21, 2015.

Q.      Declaration of Trisha Trigilio, dated April 28, 2015.

R.      Declaration of Delmy Pineda Cruz, dated April 24, 2015.

S.      Declaration of Polyane Soares de Oliveira dos Santos, dated April 24, 2015.

T.      Declaration of Lilian Castillo Rosado, dated April 24, 2015.

U.      Plaintiffs' Proposed Order