IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **DELMY PINEDA CRUZ, et al.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| v. | ) | Civil Action No. SA-15-CV-326-XR |
| | ) | |
| **ROSE THOMPSON,** | ) | |
| **Warden, Karnes County** | ) | |
| **Residential Center,** *et al.* | ) | |
| | ) | |
| **Defendants.** | ) | |

_____

### FEDERAL DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

On April 23, 2014, Plaintiffs filed a Class Action Complaint (ECF No. 1) alleging that Defendants had retaliated against Plaintiffs for exercising their First Amendment rights by protesting their detentions at the Karnes County Residential Center ("Karnes"), and seeking an injunction preventing the alleged retaliation. On April 29, 2015, Plaintiffs filed a Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 5) seeking the same relief on an expedited basis. On April 29, 2015 the Court issued an Order (ECF No. 6) setting Plaintiffs' Motion for a hearing on May 7, 2015.

The Court should deny Plaintiffs' Motion because Plaintiffs have an exceedingly low likelihood of success on the merits of their claims. Most notably, this is because Plaintiffs have not pleaded any jurisdictional basis for their claim that would serve as a waiver of sovereign immunity and therefore this Court lacks jurisdiction over Plaintiffs' claims. Further, even if this Court has jurisdiction over Plaintiffs' claims, Plaintiffs have failed to state any claim under the

First Amendment. As non-resident aliens who have not gained admission or entry to the United States – and who have not established connections to the United States – Plaintiffs are not entitled to prevail in a lawsuit seeking relief for alleged violations of the First Amendment.

Finally, to the extent Plaintiffs possess any ability to challenge violations of the First Amendment, their rights are not infringed upon by any U.S. Immigration and Customs Enforcement ("ICE") action. ICE's actions in this case are governed by their family residential standards relating to hunger strikes. Those standards reflect a policy for responding to hunger strikes that is reasonably related to the legitimate interests involved in safely operating family residential facilities. These standards reflect a reasonable determination by ICE on the best way to balance any right the resident may have to participate in a hunger strike against the health and safety of the resident participating in the strike, and the health and safety of others in the facility, including that resident's children. Thus, Plaintiffs cannot demonstrate that ICE's policies infringe on their First Amendment rights. Moreover, the overly-broad preliminary injunctive relief that Plaintiffs seek would impede the safe, humane, and efficient operation of the family residential housing at Karnes, and therefore there is good reason for the Court to decline to impose such injunctive relief until further development of the factual record can be had. Accordingly, this Court should deny Plaintiffs' motion and, should the Court find it lacks jurisdiction over Plaintiff's claims, dismiss their complaint in its entirety.[1]

---

[1] Plaintiffs seek preliminary injunctive relief on a class-wide basis. However, provisional class certification is appropriate only where a Court determines that the requirements of Federal Rule of Civil Procedure 23 have been met. *See Berge v. United States*, 949 F. Supp. 2d 36, 49 (D.D.C. 2013) (quoting Fed. R. Civ. P. 23 Advisory Committee Notes 2003 Amendments) ("The provision that a class certification 'may be conditional' is deleted. A court that is not satisfied that the requirements of Rule 23 have been met should refuse certification until they have been met."). Plaintiffs have filed a motion for class certification, but that motion has not yet been briefed. Plaintiffs are unlikely to succeed on their class certification motion because they are

**BACKGROUND**

**I. Reinstatement and Withholding-Only Proceedings**

Under 8 U.S.C. § 1231(a)(5), the U.S. Department of Homeland Security ("DHS") may reinstate a prior order of removal for an alien it finds "has reentered the United States illegally after having been removed or having departed voluntarily, under an order of removal."[2]  8 U.S.C. § 1231(a)(5).  When DHS reinstates a removal order, the "prior order of removal is reinstated from its original date and is not subject to being reopened or reviewed."  *Id*.  As a general rule, once DHS has reinstated a removal order, it must remove the alien.  *See id.* (providing the alien "shall be removed under the prior order"); 8 C.F.R. § 241.8(c) (providing "the alien shall be removed under the previous order of exclusion, deportation, or removal in accordance with [8 U.S.C. § 1231(a)(5)]").

There is an exception for an alien who asserts "a fear of returning to the country designated" in his reinstated removal order.  8 C.F.R. § 241.8(e).  If the alien expresses fear of persecution or torture, the alien is referred to United States Citizenship and Immigration Services ("USCIS") for an interview by an asylum officer to determine whether the alien possesses a "reasonable fear" of return. 8 C.F.R. § 208.31(b).  This initiates what is referred to as the reasonable fear determination process.  *See* Regulations Concerning the Convention Against

---

challenging alleged incidents of retaliation that are each likely to turn on the individual facts related to each claim.  Additionally, because Defendants have not had the opportunity to brief the class certification issues, provisional certification of a class at this stage would be premature.  Defendants thus request that if the Court determines that preliminary relief may be appropriate, Defendants be given the opportunity to respond to Plaintiffs' class certification motion before any such preliminary relief is ordered on a class-wide basis.

[2]     Although the relevant statutory sections refer to the Attorney General, the Homeland Security Act of 2002, Pub.L. No. 107–296 § 471, 116 Stat. 2135 (2002), transferred most immigration functions, except the Executive Office of Immigration Review, from the Department of Justice to DHS.  *See Hernandez v. Ashcroft*, 345 F.3d 824, 828 n.2 (9th Cir. 2003).

Torture, 64 Fed. Reg. 8478, 8479 (Feb. 19, 1999) ("[T]his screening process will also allow for the fair and expeditious resolution of such claims without unduly disrupting the streamlined removal processes applicable to these aliens"). USCIS has exclusive jurisdiction to make a reasonable fear determination. 8 C.F.R. § 208.31(a).

If the asylum officer determines that the alien has not established a reasonable fear, the alien may request review of that determination by an immigration judge. 8 C.F.R. § 208.31(f). If the immigration judge concurs with the determination that no reasonable fear of persecution or torture exists, the case is returned to DHS for execution of the reinstated order of removal, and no administrative appeal is available. 8 C.F.R. § 208.31(g)(1). If, on the other hand, the asylum officer determines that the alien has established a reasonable fear of persecution or torture, the alien is referred to the immigration judge for consideration of withholding of removal only. 8 C.F.R. § 208.31(e). In withholding-only proceedings, the immigration judge is limited to consideration of this form of protection. 8 C.F.R. § 1208.2(c)(3)(i) ("The scope of review in [withholding-only] proceedings . . . shall be limited to a determination of whether the alien is eligible for withholding or deferral of removal."). Indeed, during withholding-only proceedings, "all parties are prohibited from raising or considering any other issues, including but not limited to issues of admissibility, deportability, eligibility for waivers, and eligibility for any other form of relief." *Id.*

Withholding of removal is country-specific relief; thus, even if an alien ultimately succeeds on his withholding claim, he could potentially be removed to an alternate country. *See* 8 U.S.C. § 1231(b)(2)(E); 8 C.F.R. § 1208.16(f); *Lanza v. Ashcroft*, 389 F.3d 917, 933 (9th Cir. 2004) (stating that a grant of withholding "only prohibits removal of the petitioner to the country of risk, but does not prohibit removal to a non-risk country"). Additionally, an alien who is granted

protection from removal to a specific country is ineligible to apply for any form of relief under the Immigration and Naturalization Act ("INA"), including adjustment of status. 8 U.S.C. § 1231(a)(5) (providing that an alien subject to reinstatement "is not eligible and may not apply for any relief under [the INA]"). Thus, the alien remains removable.

## II. Plaintiff Delmy Pineda-Cruz

Plaintiff Delmy Pineda-Cruz was first encountered by ICE on April 12, 2007 in Chicago, Illinois (at the time she was processed using the name Mirta Salvadora-Lepe). *See* Record of Deportable/Inadmissible Alien, Form I-213, at 2, dated April 12, 2007, attached hereto as Exhibit A. She claimed to be a native and citizen of Mexico and to have last entered the United States illegally on or about April 9, 2007. *Id.* ICE determined that she was from Guatemala, and she was removed from the United States in August, 2007 to Guatemala. *See* Information for Travel Document or Passport, dated July 10, 2007, attached hereto as Exhibit B.

She reentered the United States on or around September 3, 2014 and was encountered by U.S. Customs and Border Protection ("CBP") at or near Hidalgo, Texas in the Rio Grande Valley, Texas Border Patrol Sector, with her child. *See* Record of Deportable/Inadmissible Alien, Form I-213, dated Sept. 4, 2014, attached hereto as Exhibit C; Notice of Intent/Decision to Reinstate Prior Order, Form I-871, dated Sept. 4, 2014, attached hereto as Exhibit D. She claimed to be a native and citizen of Honduras. *See* Exhibit C. She was processed for reinstated removal proceedings. *See* Exhibit D. She and her child were transported to Karnes. Complaint ¶ 10. She is in withholding-only removal proceedings because she claimed a fear of returning to her home country. Complaint ¶ 10. She is scheduled for a merits hearing before the immigration court on May 26, 2015. Notice of Hearing in Removal Proceedings, April 27, 2015, attached hereto as Exhibit P.

### III. Plaintiff Polyane Soares de Oliveira dos Santos

Plaintiff Polyane Soares de Oliveira dos Santos was first apprehended on June 22, 2005 near the Rio Grande City, Texas Port of Entry. Record of Deportable/Inadmissible Alien, Form I-213, dated June 22, 2005, at 2, attached hereto as Exhibit E. She is a native and citizen of Brazil. *Id.* She claimed she entered the United States illegally on or about June 22, 2005. *Id.* She was served with a Notice to Appear and released. *Id.* at 2-3. On June 9, 2006, an immigration court ordered her removed in absentia when she failed to appear for her hearing. Order of the Immigration Judge, dated June 9, 2006, attached hereto as Exhibit F.

She was next encountered on August 1, 2014 at or near Hidalgo, Texas in the Rio Grande Valley, Texas Border Patrol Sector with her child. Record of Deportable/Inadmissible Alien, Form I-213, dated Aug. 1, 2014, at 3, attached hereto as Exhibit G. She was processed for reinstated removal proceedings. *Id.* at 3. She and her child were transported to Karnes. Complaint ¶ 11. She is in withholding-only removal proceedings because she claimed a fear of returning to her home country. Complaint ¶ 11. On May 1, 2015 a merits hearing was held in her case and testimony was completed. Her case was reset to May 4, 2015 for an oral decision from the immigration judge. Notice of Hearing in Removal Proceedings, May 1, 2015, attached hereto as Exhibit Q.

### IV. Plaintiff Lillian Castillo-Rosado

Plaintiff Lillian Castillo-Rosado was first encountered by CBP on August 18, 2013 in the Rio Grande Valley, Texas Border Patrol Sector. Record of Deportable/Inadmissible Alien, Form I-213, Aug. 16, 2013, attached hereto as Exhibit H. She admitted she was a citizen of Honduras and that she had entered the United States illegally. *Id.* She was processed for an expedited removal and was removed to Honduras on August 27, 2013. *Id. see also* Notice and Order of

6

Expedited Removal, Form I-860, dated August 19, 2013, attached hereto as Exhibit I; Notice to Alien Ordered Removed/Departure Verification, Form I-296, dated Aug. 19, 2013, attached hereto as Exhibit J.

She was next encountered by CBP on August 1, 2014 in the Rio Grande Valley, Texas Border Patrol Sector with her child.  Record of Deportable/Inadmissible Alien, Form I-213, dated Aug. 1, 2014, at 3, attached hereto as Exhibit K   She was transported with her child to Karnes.  Complaint ¶ 12.  On August 2, 2014, ICE discovered the prior removal order and processed her for reinstated removal proceedings.  Notice of Intent/Decision to Reinstate Prior Order, Form I-871, dated Aug. 2, 2014, attached hereto as Exhibit L.  She is in withholding-only removal proceedings because she claimed a fear of returning to her home country.  Complaint ¶ 12.  She is scheduled for a merits hearing before the immigration court on May 12, 2015.  Notice of Hearing in Removal Proceedings, April 27, 2015, attached hereto as Exhibit R.

## **STANDARDS OF REVIEW**

A preliminary injunction is an extraordinary remedy for which the plaintiff bears the burden of proving the prerequisites by clear and convincing evidence. *Granny Goose Foods, Inc. v. Brotherhood of Teamsters*, 415 U.S. 423, 441 (1974); *Canal Authority of Florida v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974).  To sustain a motion for preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), Plaintiffs bear the burden of proving that four requisite factors are met. *Granny Goose Foods, Inc.*, 415 U.S. at 442-43; *Callaway*, 489 F.2d at 572. First, Plaintiffs must demonstrate a substantial likelihood of success on the merits. *Callaway*, 489 F.2d at 572; *Lakedreams v. Taylor*, 932 F.2d 1103, 1107 (5th Cir. 1991); *Sierra Club v. Espy*, 38 F.3d 792, 798 (5th Cir. 1994). Second, Plaintiffs must demonstrate that they will be irreparably injured if the Court does not issue a preliminary injunction. *Id.* Third,

Plaintiffs must demonstrate that a preliminary injunction will not substantially injure any party. *Id.* Finally, Plaintiffs must demonstrate that a preliminary injunction would be in the public interest. *Id.*

## ARGUMENT

### I. Plaintiffs' Likelihood of Success on the Merits is Extremely Low

Plaintiffs' likelihood of success on the merits is exceedingly low as Plaintiffs' amended complaint fails to state a claim for which the Court can grant them any relief and has fatal jurisdictional defects. To start, Plaintiffs have stated no valid jurisdictional basis for their claims. Additionally, Plaintiffs have failed to state a claim for any violation of their First Amendment rights because Plaintiffs, as nonresident aliens who have not established any connections to the United States, do not possess the ability to file a lawsuit claiming violations of the First Amendment. Finally, even if Plaintiffs' claims could be adjudicated in a First Amendment lawsuit, Plaintiffs have not stated a claim that they have been harmed by any agency action because ICE family residential standards reflect policy that is reasonably related to legitimate interests in the safe, humane, and efficient operation of family residential facilities. Thus, Plaintiffs are unlikely to succeed on the merits in this matter.

#### a. *Plaintiffs Have Not Alleged Any Valid Jurisdictional Basis for Their Claims*

Plaintiffs allege jurisdiction over this action under 28 U.S.C. § 1331 (federal question), and 28 U.S.C. §§ 2201, 2202 (Declaratory Judgment Act). Complaint ¶ 8. To the contrary, jurisdiction does not exist under any of these provisions.

1. Sovereign Immunity

Under the firmly-established doctrine of sovereign immunity, the United States may not be sued unless Congress has expressly waived the immunity defense. *See, e.g., United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *United States v. Testan*, 424 U.S. 392, 399 (1976) ("It has long been established, of course, that the United States, as sovereign, is immune from suit save as it consents to be sued . . . and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.") (internal quotations omitted). Where a plaintiff has brought suit against the federal government (or a government official sued as such), a federal court is without jurisdiction to consider the complaint in the absence of an express waiver of sovereign immunity. *See FDIC v. Meyer*, 510 U.S. 471, 475 (1994) (noting that "[s]overeign immunity is jurisdictional in nature").

The federal government can waive its sovereign immunity and consent to be sued. This is typically done by statute. *See*, *e.g.*, 28 U.S.C. § 1346(b)(1) (explicitly allowing tort suits against the United States); 5 U.S.C § 702 (Administrative Procedure Act) (containing a limited waiver of sovereign immunity waiver for review of agency action). However, a "[p]laintiff bears the burden of showing Congress's unequivocal waiver of sovereign immunity." *St. Tammany Parish ex rel. Davis v. Fed. Emergency Mgmt. Agency*, 556 F.3d 307, 315 (5th Cir. 2009); *see also Freeman v. United States*, 556 F.3d 326, 334 (5th Cir. 2009). Plaintiffs' Complaint cites to no waiver of sovereign immunity, and therefore the Court lacks jurisdiction over their claims.[3]

---

[3] While Plaintiffs did not cite to the Administrative Procedure Act ("APA") as a waiver of sovereign immunity, even if they were to do so it would not save their claims. The Fifth Circuit recently held that a final agency action is required before the APA may serve as a waiver of

9

2. <u>28 U.S.C. § 1331 (Federal Question)</u>

Plaintiffs cannot sue Defendants under 28 U.S.C. § 1331 alone because this provision does not waive the Defendants' sovereign immunity. Though section 1331 grants subject matter jurisdiction to federal courts to hear cases arising under the constitution, laws, and treaties of the United States, it does not waive sovereign immunity. *See*, *e.g.*, *Koehler v. United States*, 153 F.3d 263, 266 n.2 (5th Cir. 1998) (noting that it is "[i]t is well settled [] that sovereign immunity is not waived by a general jurisdictional statute such as 28 U.S.C. § 1331") (citing *Voluntary Purchasing Groups v. Reilly*, 889 F.2d 1380, 1385 (5th Cir. 1989)); *Smith v. Booth*, 823 F.2d 94, 97 (5th Cir. 1987). Because section 1331 alone does not waive Defendants' sovereign immunity, Plaintiffs cannot rely on it as an independent jurisdictional basis for this Complaint. *See Offiiong v. Holder*, 864 F.Supp.2d 611, 625 (S.D. Tex. 2012) (explaining that 28 U.S.C. § 1331 does not authorize a suit against the government unless it is "tied" to a statute expressly waiving sovereign immunity). Because the Court cannot exercise jurisdiction over Plaintiffs' claims under section 1331, the Court should deny Plaintiffs' motion and, if the Court find it lacks jurisdiction over Plaintiffs' claims, should dismiss their complaint.

---

sovereign immunity. *Belle Co., L.L.C. v. U.S. Army Corps of Engineers*, 761 F.3d 383, 395-96 (5th Cir. 2014). Moreover, even if the Court were to apply the less stringent requirement of Section 702 of the APA – an approach *Belle* explicitly rejects – and require only that Plaintiffs state a challenge to any "agency action," Plaintiffs still cannot meet that requirement. Plaintiffs are challenging the actions of individuals who they allege retaliated against them for engaging in protest activity at Karnes. They do not challenge any "agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act." 5 U.S.C. § 551(13); *see Alabama-Coushatta Tribe of Texas v. U.S.*, 757 F.3d 484, 490 (5th Cir. 2014). Therefore Plaintiffs cannot, under any test, benefit from the waiver of sovereign immunity found in the APA. Moreover, even if Plaintiffs could raise a challenge to agency action under the APA, as discussed below, to the extent Plaintiffs are challenging the application of ICE standards to their actions, they cannot establish that those ICE standards violate the First Amendment.

3. <u>28 U.S.C. §§ 2201, 2202 (Declaratory Judgment Act)</u>

The Declaratory Judgment Act does not independently confer federal subject-matter jurisdiction in this case. "The Declaratory Judgment Act is not an independent ground for jurisdiction; it permits the award of declaratory relief only when other bases for jurisdiction are present." *Jones v. Alexander*, 609 F.2d 778, 781 (5th Cir. 1980). Though the Declaratory Judgment Act may serve as the remedy in actions properly brought under another statutory section, it is not an independent source of federal jurisdiction. *See In re-B 727 Aircraft Serial No. 21010*, 272 F.3d 264, 270 (5th Cir. 2001).[4] Accordingly, the Court should deny Plaintiffs' motion and, because the Court lacks jurisdiction over Plaintiffs' claims, should also dismiss their Complaint.

   *b. Plaintiffs Have Not Stated a Claim under the First Amendment*

Plaintiffs contend that Defendants have violated their constitutional right to free speech protected by the First Amendment. However, as non-resident aliens who have not gained admission or entry to the United States – and have not established any connections to the United States – Plaintiffs are not entitled to prevail in a lawsuit challenging violations of the Constitutional protections of the First Amendment.

It is well settled that certain aliens are not entitled to challenge violations of Constitutional rights and privileges that might be actionable if challenged by American citizens. The Supreme Court has explained that:

> the alien, to whom the United States has been traditionally hospitable, has been accorded a generous and ascending scale of rights as he increases his identity with

---

[4] Further, Plaintiffs' citation to 28 U.S.C. § 1331 coupled with 28 U.S.C. § 2201 does not establish jurisdiction or create a federal cause of action. *See Mahogany v. Louisiana State Supreme Court*, 262 F. App'x 636, 637 n.2 (5th Cir. 2008) (holding that, though 28 U.S.C. §§ 1331 and 2201 provide for federal question jurisdiction and declaratory relief, they do not create an independent private right of action).

> our society. Mere *lawful presence* in the country creates an implied assurance of safe conduct and gives him certain rights; they become more extensive and secure when he makes preliminary declaration of intention to become a citizen, and they expand to those of full citizenship upon naturalization.

*Johnson v. Eisentrager,* 339 U.S. 763, 770–71 (1950) (emphasis added). And in *United States ex rel. Turner v. Williams*, the Supreme Court found deportable aliens outside the scope of those individuals who can file a lawsuit seeking relief for violations of the First Amendment, explaining that:

> It is, of course, true, that if an alien is not permitted to enter this country, or, having entered contrary to law, is expelled, he is in fact cut off from worshiping or speaking or publishing or petitioning in the country; but that is merely because of his exclusion therefrom. He does not become one of the people to whom these things are secured by our Constitution by an attempt to enter, forbidden by law. To appeal to the Constitution is to concede that this is a land governed by that supreme law, and as under it the power to exclude has been determined to exist, those who are excluded cannot assert the rights in general obtaining in a land to which they do not belong as citizens or otherwise.

194 U.S. 279, 292 (1904).

Moreover, in *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), the Supreme Court further explained that the text of the Constitution suggested "that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments, and to whom rights and powers are reserved in the Ninth and Tenth Amendments, refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Id*. at 265 (citing *Turner*, 194 U.S. at 292); *see also Hoffman v. Bailey*, 996 F. Supp. 2d 477, 488 (E.D. La. 2014) ("In considering [*Verdugo-Urquidez*], it is clear that Defendant, a nonresident alien, is not entitled to First Amendment protections of the United States Constitution."). As a result, lawful resident aliens who are present within the constitution's jurisdiction and have "developed substantial connections with

this country" are entitled to certain constitutional protections. *Verdugo–Urquidez,* 494 U.S. at 271.

Plaintiffs, however, do not fall within this category. Here, Plaintiffs admit that they are not lawfully present in the United States nor can they claim that they were lawfully admitted. CBP encountered each of the Plaintiffs shortly after they unlawfully crossed the border in the Rio Grande Valley, and ICE has reinstated each Plaintiff's prior removal order. Complaint ¶ 19. Accordingly, Plaintiffs remain removable, and can be removed at any moment to a country who will accept them and where they do not fear removal, despite being in withholding-only proceedings.

Further, in their limited time in the United States, Plaintiffs have not developed substantial connections with this country. There is no evidence that Plaintiffs have ever resided in this country in a lawful status. Moreover, their immigration history demonstrates that each Plaintiff has spent little time in the United States. *See e.g.* Exhibits A, E, H, L (Plaintiff Pineda-Cruz claimed entry on April 9, 2007, and first encountered on April 11, 2007; Plaintiff Soares de Oliviera claimed entry on June 22, 2005, and first encountered on June 22, 2005; Plaintiff Castillo-Rosado claimed entry on August 18, 2013, and was removed on August 27, 2013). Because Plaintiffs never gained entry into the United States and have not developed substantial connections with this country, they are not within the scope of individuals contemplated by the Supreme Court as being able to raise claims under the First Amendment. Because Plaintiffs can neither show any constitutional violation under current law, nor even that their rights to raise constitutional claims in litigation were clearly established, they are unlikely to succeed on the merits of their claims.

> c. *ICE's Family Residential Standards Reflect Policy That Is Reasonably Related to Legitimate Interests in the Safe, Humane, and Efficient Operation of Family Residential Facilities.*

To the extent Plaintiffs are entitled to bring a challenge under the First Amendment, their claims must fail because ICE's family residential standards relating to discipline and responding to hunger strikes – standards that apply to *all residents* at ICE family residential facilities – reflect policy that is reasonably related to the legitimate interest of operating safe, humane, and efficient family residential facilities. In *Turner v. Safley*, the Supreme Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." 482 U.S. 78, 87 (1987). In that case, the Supreme Court upheld a Missouri rule barring inmate-to-inmate correspondence as being reasonably related to security interests. The Court also recognized the core functions of prison administration as maintaining safety and internal security. *Id*; *see also O'Lone v. Estate of Shabazz*, 482 U.S. 342, 349-50 (1987) (The standard that a regulation has to be reasonably related to legitimate penological interests "ensures the ability of corrections officials 'to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration'. . . and avoids unnecessary intrusion of the judiciary into problems particularly ill-suited to 'resolution by decree.'").

ICE has family residential standards that govern all aspects of custody at family residential centers.[5] *See* Declaration of Stephen M. Antkowiak ("Antkowiak Decl.") ¶ 6, attached hereto as Exhibit M. The family residential standards were developed with input from medical, psychological, and educational experts, as well as civil rights organizations, with the goal of mirroring community standards and ensuring that all residents are treated with dignity

---

[5] The ICE Family Residential Standards are available online at: http://www.ice.gov/detention-standards/family-residential.

14

and respect. *Id.* One section of those standards deals with "Hunger Strikes," and states that its purpose is that the "health and well-being of adult residents is protected by monitoring, counseling, and, when appropriate, treatment of any adult resident on a hunger strike." *See* ICE/DRO Residential Standard, Hunger Strikes, at 1, attached hereto as Exhibit N. ICE also has family residential standards that govern discipline and cover, among other things, a situation where a resident has participated in the offense of "insurrection," which is defined as "[p]articipation or encouraging another to participate in unauthorized activity such as protesting or rioting." *See* ICE/DRO Residential Standard, Discipline and Behavior Management, at 17, attached hereto as Exhibit O.[6]

The ICE standards relating to hunger strikes require that a medical assessment by qualified medical personnel will be obtained for any individual suspected or announced to be on a hunger strike, and that upon medical recommendation, "the resident may be placed in close supervision for observation and monitoring." Exhibit N at 2. At Karnes, temporary medical observation rooms are used for such monitoring. *See* Antkowiak Decl. ¶ 13. Those rooms are unlocked, and have large windows for observation by medical staff. *Id.* ¶ 13, Exhibits 6-11. Residents in those rooms also have access to a day room. *Id.* ¶ 13, Exhibits 12-14. Residents on a hunger strike "will be counseled and advised of the medical risks, and will be encouraged to

---

[6] Another section of the ICE family residential standards sets out the procedures for presenting grievances, both formal and informal, to ICE staff. *See* ICE/DRO Residential Standards, Grievance System, available at: http://www.ice.gov/doclib/dro/family-residential/pdf/rs_grievance_system.pdf. Those grievance procedures include a requirement for maintenance of records of any grievances filed. *Id.* at 6. There is also a specific procedure for allegations of staff misconduct that includes a requirement to report such allegations to a higher-level official within the chain of command. *Id.* at 7. Notably, no Plaintiff makes any claim that she filed any grievance with ICE regarding any of the allegations contained in the Complaint. This failure to take advantage of available administrative remedies for Plaintiffs' claims provides another good reason for the Court to decline to grant the preliminary injunctive relief that Plaintiffs seek.

end the hunger strike or to accept medical treatment." *Id.* at 1. "When medically advisable, medical personnel may place the resident in a single-occupancy observation room, for the purpose of measuring food and liquid intake and output." *Id.* If forced medical treatment becomes necessary, the resident will be transferred to an appropriate facility where intervention may be provided. *Id.* at 3-4.

The ICE disciplinary standards state that their purpose is to "provide a safe and orderly living environment" at ICE family residential facilities, and to "manage discipline and behavioral problems in a manner that ensures the safety and welfare of staff, residents, and visitors." Exhibit O at 1. "Insurrection" is considered a major offense at ICE family residential facilities, and under the standards requires separation from the general population. *Id.* at 16-17. Medical observation rooms may be used to facilitate this separation. *See* Antkowiak Decl. ¶ 13. The standards provide guidance for the investigation of such incidents and the appropriate responses, and residents are provided with notice of prohibited acts, and the processes that the facility uses to manage and respond to rules violations through the resident handbook. *Id.* at 19.

These ICE standards, which applied to Plaintiffs' activities of protesting and engaging in a hunger strike, reflect reasonable determinations by ICE that necessarily balance any right the resident may have to protest or participate in a hunger strike against the health and safety of the resident participating in the strike, and the health and safety of others in the facility including that resident's children. To the extent that Plaintiffs are challenging the Government's actions in applying these standards to their alleged activities, Plaintiffs' challenges must fail because these standards are reasonably related to the interests of order, safety, and security, at ICE family residential facilities. Thus, Plaintiffs have an exceedingly low likelihood of success on the

merits of their claims. Accordingly, the Court should deny Plaintiffs' request for emergency injunctive relief.

II. <u>Plaintiffs Cannot Show Irreparable Harm</u>

Plaintiffs state that their protests, whether through petitions or hunger strikes, are designed "to protest their continued detention." Each of the three named Plaintiffs has a reinstated prior order of removal and is therefore validly subject to detention under 8 U.S.C. § 1231. *See* 8 U.S.C. § 1231(a)(5). To the extent the harm alleged by Plaintiffs is their continued detention by ICE, this harm is not impacted by whether Plaintiffs are permitted to protest that detention. To the extent that Plaintiffs are claiming harm from any chilling of what they allege is their right to participate in a hunger strike, they cannot claim irreparable harm from a denial of a First Amendment right to participate in a hunger strike because, as discussed above, they are not entitled to bring claims invoking the protections of the First Amendment.

III. <u>The Balance of the Interests and the Public Interest Weighs in Favor of Allowing Full Development of the Factual Record Before Deciding This Case.</u>

As an initial matter, each of the three named Plaintiffs has either had a merits hearing on her underlying immigration case, or is scheduled for a merits hearing in the relatively near future. The resolution of the merits of each of their cases may determine whether they are released from detention or removed from the United States. In either case the individual would no longer reside at Karnes. Thus, any interest Plaintiffs have in protesting the facility may be short-lived, while the effects of any hastily-entered injunction might outlast that interest.

Moreover, as discussed above, ICE has in place family residential standards that reasonably balance the needs of the facility, including the need to protect the safety of all residents at Karnes, against the interests of a resident participating in a hunger strike or desiring to protest her detention. The injunctive relief sought by Plaintiffs may impact the ability of ICE

to follow its standards.  For example, Plaintiffs request a prohibition against separating a resident from her children if she participates in a hunger strike, but such separation may be medically necessary in certain situations, in accordance with the ICE residential standards.  Similarly, the requested prohibition on "interrogating" individuals about their participation in a hunger strike will make it difficult for health professionals to reasonably ask the questions necessary to monitor an individual on a hunger strike.  Similarly, the prohibition on interrogation could make it difficult for facility staff to respond to incidents of insurrection, which is considered a major offense under the standards because of its potential for disruption to the orderly running of the facility.  ICE's family residential standards are designed to ensure the safety and security of *all residents* at the Karnes facility, and entry of the overly-broad injunctive prohibitions sought by Plaintiffs – without first allowing the parties further opportunity to develop the factual record in this case – may well have the unintended consequence of interfering with the application of these standards to the detriment of the residents of Karnes.  Thus, there is a strong public and Governmental interest in declining to enter this very broad injunctive relief requested by Plaintiffs before there can be greater development of the factual record to see precisely which of Plaintiffs' allegations, if any, may necessitate injunctive relief.

## **CONCLUSION**

Defendants respectfully request that the Court deny Plaintiffs' motion for injunctive relief.

Dated: May 7, 2015                              Respectfully submitted,

BENJAMIN C. MIZER
Principal Deputy Assistant Attorney General
Civil Division
WILLIAM C. PEACHEY
Director, District Court Section
Office of Immigration Litigation
WILLIAM SILVIS
Assistant Director, District Court Section
Office of Immigration Litigation

*/s/ Sarah B. Fabian*
SARAH B. FABIAN
Senior Litigation Counsel
ELIANIS PEREZ
Senior Litigation Counsel
SARAH VUONG
Trial Attorney
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
Tel: (202) 532-4824
Fax: (202) 305-7000
Email: sarah.b.fabian@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on May 7, 2015, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

>Allison N. Boyle
>Law Office of Javier N Maldonado
>8918 Tesoro Dr., Suite 575
>San Antonio, TX 78240
>210-277-1603
>Fax: 210/587-4001
>Email: allison.n.boyle@gmail.com
>
>Javier N. Maldonado
>Law Office of Javier N. Maldonado, P.C.
>8918 Tesoro, Suite 575
>San Antonio, TX 78217
>(210) 277-1603
>Fax: (210) 587-4001
>Email: jmaldonado.law@gmail.com
>
>Ranjana Natarajan
>Civil Rights Clinic, University of Texas School of Law
>727 E. Dean Keeton St.
>Austin, TX 78705
>512-232-7222
>Fax: 512-232-0800
>Email: rnatarajan@law.utexas.edu
>
>Trisha Trigilio
>University of Texas School of Law, Civil Rights Clinic
>727 E. Dean Keeton St.
>Austin, TX 78701
>512-232-2698
>Fax: 512-232-0800
>Email: ttrigilio@law.utexas.edu

>*/s/ Sarah B. Fabian*
>SARAH B. FABIAN
>Senior Litigation Counsel
>Office of Immigration Litigation
>U.S. Department of Justice
>
>Attorney for Defendants