UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| DELMY PINEDA CRUZ,<br>POLYANE SOARES DE OLIVEIRA DOS<br>SANTOS, and<br>LILIAN CASTILLO ROSADO,<br>on behalf of themselves and all others similarly<br>situated,<br><br>                                    Plaintiffs,<br><br>              v.<br><br>ROSE THOMPSON,<br>Warden, Karnes County Residential Center;<br>JUANITA HESTER,<br>ICE Field Office Assistant Director;<br>ENRIQUE LUCERO,<br>ICE Field Office Director, San Antonio District;<br>SARAH R. SALDAÑA,<br>ICE Director;  and<br>JEH JOHNSON,<br>Secretary, U.S. Department of Homeland Security;<br>in their official capacities, and<br>THE GEO GROUP, INC.,<br><br>                                     Defendants. | Civil Action No. 15-CV-0326 |

**PLAINTIFFS' OPPOSITION TO**
**PRIVATE DEFENDANTS' MOTIONS TO DISMISS THE COMPLAINT**

**Table of Contents**

I.    Background ........................................................................................... 1

    A.    Mothers at Karnes Drafted a Petition and Began a Hunger Strike ........... 1

    B.    ICE and GEO Retaliated Against the Hunger Strikers ............................. 2

        1.    ICE Officials and GEO Employees Explicitly Threatened to Separate Striking Mothers From Their Children .................................................... 2

        2.    ICE Officials and GEO Employees Interrogated Striking Mothers and Locked Them in Isolation Rooms ....................................................... 2

        3.    ICE Officials and GEO Employees Continued Retaliating Against Mothers Who Continued Their Strike ................................................. 5

        4.    ICE Officials and GEO Employees Falsified Charges of Attempted Escape Against Hunger Strikers .................................................... 6

    C.    ICE and GEO's Actions Chilled Participation in the Hunger Strike ........ 7

II.    Legal Standard ................................................................................... 7

III.    Argument ............................................................................................ 8

    A.    This Court Has Jurisdiction to Enjoin GEO, as a Government Actor, From Violating the First Amendment ................................................ 8

    B.    Releasing the Named Plaintiffs Did Not Moot This Action ...................... 12

    C.    Plaintiffs' Allegations Support a Reasonable Inference That GEO Is Liable for Retaliation ..................................................................... 15

        1.    The First Amendment Free Speech Clause Restricts the Government from Abridging Plaintiffs' Free Speech .......................................... 16

            a.    Free Speech Protection is Not Conditional on the Speaker's Identity 16

            b.    GEO's Proposed Test for Free Speech Rights Is Unworkably Vague and Impermissibly Chills Free Speech ............................... 25

            c.    In the Alternative, If the Court Applies The Sufficient Connections Test, Plaintiffs' Connections to the United States Are Sufficient to Merit Free Speech Protection .............................................. 28

        2.    GEO's Actions Were Substantially Motivated Against Plaintiffs' Expressive Conduct ................................................................... 32

3.   GEO's Actions Would Deter a Person of Ordinary Firmness from
           Expressing Opposition to Her Family's Detention ................................. 36

    **D.   GEO's Remaining Arguments Are Irrelevant** .......................................... **41**

**IV.   Conclusion** ........................................................................................ **42**

**ARGUMENT**

The private Defendants, The GEO Group, Inc. and Rose Thompson (hereinafter "GEO"), have moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim. Dkt. No. 36. As discussed below, because GEO is a government actor, the Court has subject matter jurisdiction over this action under Section 702 of the Administrative Procedure Act. Moreover, contrary to GEO's position, the First Amendment prohibits government actors from abridging free speech of people who are within United States territory. For these reasons, GEO's motion should be denied.

**I.     Background**

   **A.     Mothers at Karnes Drafted a Petition and Began a Hunger Strike**

Karnes County Residential Center is a secure detention facility that houses mothers and children with pending immigration cases; virtually all the families seek asylum from life-threatening violence and sexual violence. Compl. ¶¶ 19–22 (Dkt. No. 1). In late March 2015, mothers at Karnes circulated a petition to protest their detention. *Id.* ¶ 37. The petition stated that the mothers sought their release from detention, complained of the harsh conditions endured by their children, and announced a hunger strike to protest Immigration and Customs Enforcement's (ICE's) decision to continue detaining them. *Id.* Nearly eighty mothers decided to refuse meals at the Karnes dining hall during Holy Week, the week leading up to Easter. *Id.* Ms. Soares de Oliveira dos Santos helped to collect signatures, and Ms. Pineda Cruz delivered the petition to RAICES, an advocacy organization for immigrants, on Monday, March 30, 2015. *Id.* ¶¶ 38–39. Mothers began refusing breakfast at the dining hall that morning. *Id.* ¶ 40.

During the weeklong hunger strike, mothers refused to go to or eat at the dining hall. *Id.* ¶¶ 40–41. The striking mothers continued drinking liquids and occasionally

eating small items purchased from the commissary to ensure that they were able to care for their children. *Id.* The strike was entirely passive and nonviolent. *Id.* ICE and GEO knew that the striking mothers were feeding their children on a regular schedule with food from the commissary. *Id.* ¶ 44.

**B.      ICE and GEO Retaliated Against the Hunger Strikers**

**1.      ICE Officials and GEO Employees Explicitly Threatened to Separate Striking Mothers From Their Children**

The day the hunger strike began, ICE officials directed all women participating in the strike to attend a meeting with ICE officials and GEO guards. *Id.* ¶¶ 42–47. ICE officials at that meeting asked about the purpose of the hunger strike. *Id.* The striking mothers made it clear that their strike was to protest the conditions at Karnes and persuade ICE to release them from detention. *Id.* In response, ICE officials accused the striking mothers of being bad mothers, and threatened to separate the mothers from their children if they continued with their strike. *Id.* The ICE officials said that if the mothers continued with their hunger strike, they would be mentally unfit to care for their children. *Id.* Many mothers worried that their refusal to eat could be used as a pretext to diagnose them with a mental health problem and take away their children. *Id.* ICE's threats intimidated many of the striking mothers into backing out of the strike because the mothers feared that they would lose their children. *Id.*

**2.      ICE Officials and GEO Employees Interrogated Striking Mothers and Locked Them in Isolation Rooms**

ICE officials and GEO employees separated three of the striking mothers from the rest of the detainees, interrogated them about the strike, threatened them, and locked them in isolation rooms. *Id.* ¶¶ 48–74. The isolation rooms were small, spare rooms with exposed toilets and no privacy. *Id.* ¶¶ 48–50, 54, 59, 69. All three women who were

locked in isolation felt terrified, in part because no one would tell them how long they would be locked inside. *Id.* ¶¶ 48–74. These three striking mothers were variously told that they were in isolation for "medical observation," pending an "investigation" into the strike, on ICE's orders, and for punishment. *Id.* ¶¶ 51, 57, 58, 62, 64, 68. One woman, Plaintiff Soares de Oliveira dos Santos, was told she would be released only if she confessed the name of the leader of the strike. *Id.* ¶ 68. Another, Plaintiff Pineda Cruz, was told that she was locked away because she delivered the petition to an outsider. *Id.* ¶ 57.

*ICE and GEO Locked Away Children of Striking Mothers*

ICE and GEO locked away two children, Alexis Pineda and Alejandro Galeano, along with their mothers, because their mothers were associated with the hunger strike. *Id.* ¶¶ 48–66.

First, ICE and GEO locked away Plaintiff Pineda Cruz. *Id.* ¶¶ 48–56. She was locked up alone, in a small, dark room, without anyone telling her what was going on. *Id.* She remained in the room, in darkness, until guards turned on the light and locked her eleven-year-old son Alexis into the room with her. *Id.* Later still, a GEO guard came into the room and told Ms. Pineda Cruz that she was under medical observation, although nothing was wrong with her. *Id.* Alexis asked to leave, but the guard refused. *Id.* Alexis cried and worried that he would be sent back to Honduras. *Id.* Ms. Pineda Cruz and her son were ultimately locked in the room overnight. *Id.* It was very uncomfortable, lacked privacy. *Id.* The bed was not big enough for the two of them, but even if it had been, Ms. Pineda Cruz could not sleep out of anxiety. *Id.* She and Alexis were not released until late the next morning. *Id.*

Kenia Galeano was also locked in an isolation room with her son, Alejandro, who is just two years old. *Id.* ¶¶ 58–66. Shortly after she and Alejandro were locked into the room, a GEO guard required her to write a statement about the strike. *Id.* Ms. Galeano worried that her participation in the hunger strike would be used to deport her, and used different handwriting on her statement out of fear. *Id.* When the guard returned, she insisted that she had not broken any rules, but she was told that she needed to remain in isolation for an investigation. *Id.* She was later told that she was being punished. *Id.* All the while, Ms. Yakeline Galeano felt afraid for her son. *Id.* At two years old, he was too young to understand what was going on. *Id.* He cried until he fell asleep around 9:00 at night. *Id.* Ms. Yakeline Galeano could barely sleep at all; there was only one bed for her and her son. *Id.* Nobody returned to the isolation room until 6:30 the next morning, and no one ever came to speak with her about the "investigation." *Id.*

### ICE and GEO Isolated and Interrogated Another Striking Mother

Both ICE officials and GEO employees interrogated Ms. Soares de Oliveira dos Santos about the leader of the strike. *Id.* ¶¶ 67–74. In the first session, multiple GEO employees interrogated her about the leader of the strike, and threatened to lock her up until she confessed the leader's identity. *Id.* GEO employees then released Ms. Soares de Oliveira dos Santos for twenty minutes, and ordered her back to the medical area again to be locked away. *Id.* She remained in the isolation room, worrying about how long she would be in the room and the well-being of her daughter, for a long period of time. *Id.* ICE officers entered and interrogated her again. *Id.* One of the ICE officers said that ICE would take her daughter to another detention center if she went on with the strike. *Id.*

They used her daughter as leverage, threatening to hold her daughter in isolation as well. *Id.*

All three of the striking mothers whom ICE and GEO locked away were terrified by this experience. *Id*. Many other mothers dropped out of the strike when they realized that ICE and GEO were willing to lock their children in isolation. *Id*. ¶¶ 77–79.

### 3.   ICE Officials and GEO Employees Continued Retaliating Against Mothers Who Continued Their Strike

ICE officials and GEO employees carried out many other retaliatory acts against mothers who persevered during the first week of the hunger strike. They fired all striking mothers from their work assignments. *Id*. ¶¶ 80–83. At that point, many women stopped protesting and left the hunger strike, rather than lose their jobs, because they needed money to buy food their children would actually eat. *Id*. Children refuse to eat the poorly prepared, undercooked food GEO serves in the dining hall. *Id*. ¶¶ 26–28, 80–83. Taking away the striking mothers' jobs forced them to choose between protesting and doing their best to care for their children.

Defendants told some striking mothers that they would be deported if they continued the strike. *Id*. ¶¶ 85–86. Because ICE and GEO have such a close relationship, and because deportation is such a terrifying prospect for many detainees at Karnes, striking mothers reasonably took this threat seriously and feared that continuing to protest would result in deportation. *Id*. ¶¶ 19–20, 25, 62, 106–111. Defendants also gave striking mothers trouble with email access, telephone access, and buying food for their children at the commissary. *Id*. ¶¶ 87–89. GEO guards refused to allow a nun to visit with a hunger striker on Good Friday. *Id*. ¶ 90. Defendants took one mother's name off the resident count, leading her to believe that she was being deported. *Id*. ¶ 92. GEO guards

interrogated at least one striking mother about her visit with a community member, and demanded that she write a statement, in an attempt to intimidate her out of speaking with outsiders about her detention. *Id.* ¶ 93.

In the aggregate, Defendants' actions formed a pattern of harassment communicating to Plaintiffs and other protesting mothers that the strike carried a risk of deportation, isolation, interrogation, intimidation, interference with the well-being of striking mothers' children, and interference with communication with attorneys and family members. The harassment had its intended effect. By the end of the week, as a result of ICE and GEO's retaliatory actions, many women had quit the strike. *Id.* ¶¶ 42–47, 80–83.

> ### 4.   ICE Officials and GEO Employees Falsified Charges of Attempted Escape Against Hunger Strikers

ICE officials instructed GEO employees to discipline striking mothers, resulting in falsification of a charge that striking mothers attempted to escape by flagging down a helicopter. On Wednesday, April 1, halfway through the first hunger strike, GEO guards were harassing the mothers by videotaping them with handheld cameras. *Id.* ¶¶ 94–101. The guards were standing close by and videotaping the mothers and their children during their recreation time in order to show that there was no hunger strike at Karnes. *Id.* The striking mothers decided to show the truth, that they were protesting, by writing on eight sheets of printer paper and holding them up to spell "L-I-B-E-R-T-A-D," which means freedom in Spanish. *Id.* GEO guards ordered the mothers into their rooms before their recreation time had ended. *Id.* The mothers discussed the issue with the guards for a few minutes, and then went to their dorms. *Id.* That night, the GEO guards kept everyone in the facility on lockdown during the normal hours for recreation. *Id.* The next morning, at

ICE instruction, a GEO guard charged some of the striking mothers who had held the "L-I-B-E-R-T-A-D" sign with committing "insurrection," baselessly claiming that the mothers were waving the sign and waiting for a helicopter to rescue them. *Id.* ¶ 98.

### C. ICE and GEO's Actions Chilled Participation in the Hunger Strike

The striking mothers suspended their strike on Saturday, April 4, 2015, to give ICE ten days to consider their demands. *Id.* ¶ 102. ICE did not formally respond, and the hunger strike resumed on April 14, 2015. *Id.* While the chilling effect of ICE and GEO's prior conduct persisted, ICE and GEO also actively continued to retaliate against hunger strikers. During daily weigh-ins, GEO staff who performed the weigh-ins urged mothers to stop striking lest their children be taken away. *Id.* ¶ 104. The staff performing the weigh-in also threatened to lock mothers in isolation if they continued their strike. *Id.* ¶ 105. In the aggregate, these actions cast a long shadow over detainees' speech at Karnes. These actions formed the basis for detainees at Karnes to reasonably believe that they would be punished for speaking out about their detention. *Id.* ¶¶ 42–47, 80–83, 105, 112, 113, 123(b), 126, 128.

## II. Legal Standard

GEO has moved to dismiss the complaint on two different grounds. First, GEO challenges the Court's subject matter jurisdiction over this action under Rule 12(b)(1) of the Federal Rules of Civil Procedure. A complaint survives a motion to dismiss under Rule 12(b)(1) if the facts alleged in the complaint satisfy the jurisdictional requirements of the relevant statute; it is unnecessary to make a formal recitation of the basis for jurisdiction. *Belle Co. v. U.S. Army Corps of Engineers*, 761 F.3d 383, 396 (5th Cir. 2014), *cert. denied sub nom. Kent Recycling Servs., LLC v. U.S. Army Corps of Engineers*, 135 S.Ct. 1548 (2015). The Court must accept the factual allegations in the

complaint as true, unless defendants challenge the substance of the jurisdictional allegations by submitting evidence to the contrary. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (holding judge may review evidence if resolution of a 12(b)(1) motion turns on contested facts); *Ballew v. Continental Airlines, Inc.*, 668 F.3d 777, 781 (5th Cir. 2012) (permitting resolution of 12(b)(1) motion based on the complaint, "undisputed facts evidenced in the record," and "the Court's resolution of disputed facts").

Second, GEO challenges the claims in the complaint under Rule 12(b)(6). A complaint survives a motion to dismiss under Rule 12(b)(6) if it makes a short, plain statement of a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). A claim is "plausible" if it would be reasonable to infer the defendant's liability from the factual allegations in the complaint. *Id.* (citing *Twombly*, 550 U.S. at 556). To assess plausibility, the court may reject any "[t]hreadbare recitals of the elements of a cause of action," which are essentially legal conclusions, but must accept all factual allegations in the complaint as true. *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). After separating legal conclusions from well-pleaded factual allegations, the court must determine whether the facts alleged support a reasonable inference to the defendant's liability. *Id.*

## III.   Argument

### A.   This Court Has Jurisdiction to Enjoin GEO, as a Government Actor, From Violating the First Amendment

GEO's argument over subject matter jurisdiction makes three basic points: one, private prison corporations cannot be sued under *Bivens*; two, employees of private prison corporations cannot be sued under *Bivens*; and three, injunctive relief is

unavailable (and should remain unavailable) under *Bivens*. GEO Mot. at 20–28.[1] None of these arguments are relevant because Plaintiffs do not seek relief under *Bivens*—they seek an injunction against GEO as a government actor under the First Amendment.

The Supreme Court has specifically noted that injunctive relief is available to correct unconstitutional actions by private prison corporations. In *Correctional Services Corporation v. Malesko*, the Supreme Court considered whether to extend *Bivens* liability to private prison corporations. The Court declined to do so because of the other potential remedies available to the plaintiff—including, the Court specified, "injunctive relief[, which] has long been recognized as the proper means for preventing entities from acting unconstitutionally." 534 U.S. at 74. The Fifth Circuit has repeatedly applied *Malesko* to hold that injunctive relief is appropriate to correct unconstitutional actions by private prison corporations. *See, e.g.*, *Cervantes v. Dixon*, 2014 WL 5285699, *3 (N.D. Tex. Oct. 14, 2014) (citing *Malesko* and holding, in a case against private prison officials, "injunctive relief may be appropriate if it is determined that prison officials are acting unconstitutionally"); *Perez v. Dalby Health Serv.*, 2014 WL 3827505, *4 (N.D. Tex. Aug. 4, 2014), *appeal docketed*, No. 14-11137 (5th Cir. Oct. 17, 2014) (citing *Malesko* and holding, in a case against private prison officials, "Federal inmates may sue to enjoin prison officials from violating their constitutional rights."); *Macias v. Dixon*, 2014 WL 1930222, *3 (N.D. Tex. May 14, 2014) (citing *Malesko*); *Diaz v. Dixon*, 2014 WL 1744110, *4 (N.D. Tex. May 1, 2014) (same); *Hernandez v. Dixon*, 2012 WL 6839329,

---

[1] GEO also argues, in a footnote, that this action is moot. GEO Mot. at 1–2 n.1.  Because of limitations on briefing space, Plaintiffs respond to GEO's argument by footnote and refer the Court to their briefing on mootness in opposition to the federal Defendants' motion to dismiss.  Pls. Opp., Dkt. No. 46 at 11–13.

\*2 (N.D. Tex. Dec. 12, 2012) ("To . . . preclude[] federal courts from hearing actions filed by federal prisoners for injunctive relief . . . would contravene the established practice to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution.") (alterations and citations omitted). The Fifth Circuit itself has noted, in a case against a private prison corporation, that injunctive relief is proper "for the limited purpose of correcting proven constitutional violations." *Eltayib v. Cornell Cos., Inc.*, 533 Fed. App'x 414, 415 (5th Cir. 2013) (per curiam). GEO's two citations to the contrary, both from a district court in another circuit, are neither authoritative nor persuasive.

In its capacity as custodian of Plaintiffs, GEO is a government actor for purposes of the First Amendment. The actions of private entities can be regarded as government action for First Amendment purposes. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 378 (1995); *San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 546 (1987) [hereinafter *SFAA*]. The tests for determining whether private entities are state actors for purposes of 42 U.S.C. § 1983 also apply to determine whether private actors are state actors under the First Amendment. *See Lebron*, 513 U.S. at 378 (applying standard for government action from a § 1983 case, *Burton v. Wilmington Parking Auth.*, 365 U.S. 715 (1961)); *SFAA*, 483 U.S. at 546 (applying cases including *Rendell-Baker v. Kohn*, 457 U.S. 830 (1982) (§ 1983 standard)).

GEO's retaliation against the hunger strikers constitutes government action for at least two reasons. First, GEO is performing a fundamentally governmental function. ICE and Karnes County have contracted with GEO to operate Karnes on behalf of ICE, which is responsible for the well-being of noncitizens who are detained pending the completion

of removal proceedings. Ex. D (Karnes Intergovernmental Service Agreement). When the state endows private corporations with "powers or functions governmental in nature," the private corporation becomes a state actor subject to constitutional limitations. *Rosborough v. Mgmt. & Training Corp.*, 350 F.3d 459, 460 (5th Cir. 2003) (quoting *Evans v. Newton*, 382 U.S. 296, 299 (1966)). This test asks whether, when a private corporation takes actions alleged to be unconstitutional, the corporation was fulfilling a governmental function. *Cornish v. Corr. Svcs. Corp.*, 402 F.3d 545, 549–50 (5th Cir. 2005). The Fifth Circuit has held that, because confining people is "clearly" a governmental function, a private prison corporation's actions as a custodian are subject to limitations imposed by the Constitution. *Rosborough*, 350 F.3d at 461 (per curiam); *compare Cornish*, 402 F.3d at 550 (holding prison company's actions as an employer are not governmental functions because employment is a private function, whereas confining people is a governmental function). Here, GEO is subject to the First Amendment when acting as Plaintiffs' custodian pursuant to federal immigration law, an undoubtedly governmental function.

Second, GEO is acting on ICE's orders. When a private corporation acts pursuant to state compulsion, the private corporation is a government actor. *Id.* (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 170–71 (1970)). Even if GEO is a "willful participant in joint action" with ICE, *id.* (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)), or ICE is merely providing "significant encouragement" for GEO's actions, *id.* (quoting *Adickes*, 398 U.S. at 170–71), GEO is subject to the First Amendment as a government actor. That is the case here. ICE oversees GEO's operations at Karnes; there are ICE officials on-site, directing operations at all times. Ex. D. ICE sets the standards for operations at Karnes by

issuing Family Residential Standards, and GEO is contractually obligated to abide by those standards.[2] ICE and GEO employees have explicitly stated to Plaintiffs that GEO's retaliatory actions were in accordance with ICE's orders. Ex. A (Decl. of Delmy Pineda Cruz) ¶ 44; Ex. C (Decl. of Kenia Galeano) ¶¶ 17, 43. GEO generally consults with ICE before acting and defers to ICE when ICE officials are in the room. Ex. B (Decl. of Polyane Soares de Oliveira dos Santos) ¶¶ 41–59; Ex. C ¶¶ 10, 42. GEO acts as a middleman between the hunger strikers and ICE, fulfilling ICE's instructions to squash the hunger strike while ensuring ICE doesn't get its hands dirty with specific retaliatory acts. Ex. C ¶ 33. Whether this arrangement is framed as ICE "exert[ing] coercive power" over GEO, ICE providing "significant encouragement" to GEO, or GEO "willful[ly] participa[ting] in joint action" with ICE, the conclusion is the same: GEO is a government actor subject to the limitations of the First Amendment. *Cornish*, 402 F.3d at 549–550.

### B. Releasing the Named Plaintiffs Did Not Moot This Action

GEO argues in a footnote that, because the named Plaintiffs have been released from ICE detention, the Court must dismiss this action as moot. GEO Mot. at 1–2 n.1. GEO further argues that the relation-back doctrine, which permits class certification where defendants have the power to continuously moot the claims of each named plaintiff, does not apply to this case.

---

[2] ICE Family Residential Standards, *available at* http://www.ice.gov/detention-standards/family-residential.

The federal Defendants' decision to release the Plaintiffs did not moot this case. The relation-back doctrine protects the district court's authority to certify a class where "defendants have the ability by tender to each named plaintiff effectively to prevent any plaintiff in the class from procuring a decision on class certification." *Zeidman v. J. Ray McDermott & Co.,* 651 F.2d 1030, 1050–51 (5th Cir. 1981) (collecting similar precedent from other circuits). Contrary to the Defendants' contention, *Zeidman* can apply before a class has been certified—the very purpose of the doctrine is to permit the Court to rule on class certification where a plaintiff's claims are inherently transitory. *Fontenot v. McCraw*, 777 F.3d 741, 751 (5th Cir. 2015) ("*Zeidman* is predicated on a class certification motion's having been diligently filed and pursued at the time the named plaintiff's claim becomes moot."). And, contrary to GEO's contention, it is irrelevant whether the named Plaintiffs' claims are mooted as a result of a settlement agreement. *Id.* (describing relation back for claims that are "capable of repetition yet evading review"). The question is whether the transitory nature of the claim prohibits the court from ruling on a class certification motion that is otherwise diligently pursued. *Id.* Claims about conditions during brief periods of detention are classic relation-back claims. *See U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980) (permitting relation back for representative of parolees challenging conditions of parole); *Gerstein v. Pugh*, 420 U.S. 103, 110 n.11 (1975) (permitting relation back for certified class of detainees challenging conditions of pretrial detention: "The length of pretrial custody cannot be ascertained at the outset, and it may be ended at any time by [government action]."); *Rocky v. King*, 900 F.2d 864, 870 (5th Cir. 1990) (collecting cases supporting relation back for class action claims challenging pretrial detention and brief civil commitment). *Cf. Bell v. Wolfish*, 441

13

U.S. 526 n.5 (1979) (holding class action was not mooted by petitioners' release from pretrial detention because claims about conditions of confinement were capable of repetition, yet evading review.").

The Defendants' conduct in this case has the same troublesome potential for evading review as the Supreme Court described in *Gerstein*. After refusing to set a bond for Ms. Pineda Cruz and Ms. Soares de Oliveira dos Santos for months, ICE released both mothers and their children following initiation of this lawsuit. Ms. Castillo Rosado and her son were released from custody because they were granted the right to remain in the United States; she was granted withholding of removal and her son was granted asylum. Of then other putative class members with whom counsel arranged a meeting, seven were released before the meeting took place, and the three whom counsel met expected to be released within a week. Ex. E (Decl. of Trisha Trigilio). According to DHS representations in other litigation, ICE is releasing more and more families from family detention facilities, including Karnes, within thirty days of their apprehension.[3] In addition, the federal Defendants have the power to set bonds, release class members' families on conditions, or approve class members' applications for asylum at any time. *Accord Mississippi Protection & Advocacy Sys. v. Cotten*, 929 F.2d 1054, 1057–58 (5th Cir. 1991) (upholding relation back for residents in state-run facility challenging lack of

---

[3] In May and June 2015, ICE announced policy changes to its family detention program, including its intention to shorten detention periods for families found to have a credible or reasonable fear of persecution. ICE states that it expects shorter family detention timeframes as it continues to implement these policy changes. *See* Declaration of Thomas Homan, Executive Associate Director for ICE Enforcement and Removal Operations, August 6, 2015, filed as ECF No. 184-1 in Flores v. Lynch, CV-85-4544 (DMG) (C.D. Ca.) ¶¶ 22–23 (noting that for January to June 2015, the duration of family detention was 30 days for 43% of families in detention, and explaining why ICE expects that percentage to rise in light of recent policy changes).

access to counsel, where defendants granted the named plaintiff access to counsel). Claims about unconstitutional conditions in short-term detention are exactly the sort of claims the relation-back doctrine is intended to protect.

In short, release of the named Plaintiffs has not mooted this action. As the Fifth Circuit noted, upholding relation back in a class action on behalf of nursing home residents, release of the named Plaintiffs is not the same as "a case in which the entire class's claims are mooted because of the defendant's general policy change." *Grant ex rel. Family Eldercare v. Gilbert*, 324 F.3d 383, 390 (5th Cir. 2003). Instead, where defendants claim, as here, that their challenged conduct is lawful, a live controversy persists. *Id.*

### C.    Plaintiffs' Allegations Support a Reasonable Inference That GEO Is Liable for Retaliation

In addition to prohibiting direct restrictions on speech, belief, and association, the First Amendment prohibits adverse government action in retaliation for exercise of those freedoms. *Izen v. Catalina*, 398 F.3d 363, 367 (5th Cir. 2005) (quoting *Colson v. Grohman*, 174 F.3d 498, 508 (5th Cir. 1999)). This is because, by penalizing speech, belief, or association, government actors "chill[] the exercise of First Amendment freedoms and thereby indirectly produces a result that the government cannot command directly." *Colson*, 174 F.3d at 509 (citing *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)). By taking adverse action against people who choose to speak out, the government effectively penalizes and inhibits speech, which is exactly what the First Amendment is designed to forbid. *Id.* at 509–10 (quoting *Perry*, 408 U.S. at 597).

To prove retaliation, a plaintiff must show that she was engaged in activity protected by the First Amendment, that the defendant injured the plaintiff in a way that

would deter a person of ordinary firmness from continuing the protected activity, and that the defendant's actions were substantially motivated against the plaintiff's protected activity. *Izen*, 398 F.3d at 367.

### 1. The First Amendment Free Speech Clause Restricts the Government from Abridging Plaintiffs' Free Speech

The government argues that it is constitutional for government agents to suppress the Plaintiffs' speech because of the Plaintiffs' immigration status. Fed. Def. Mot. at 12. More specifically, they argue that the free speech rights of undocumented immigrants in United States territory vary according to each individual's connection to the United States, and Plaintiffs have not pled sufficient connections to justify protecting them from governmental retaliation. *Id.*

The Court cannot endorse this approach for two reasons. First, GEO asks the Court to dismantle the Free Speech Clause's application to all persons the United States, using a speaker-based approach forbidden by the Supreme Court. Second, if the Court were to endorse a speaker-based analysis, GEO's proposal is unworkable and so vague as to impermissibly chill the speech of people who do have free speech rights. Finally, even if the Court does apply a speaker-based test, the Plaintiffs have connections to the United States sufficient to warrant free speech protection.

### a. Free Speech Protection is Not Conditional on the Speaker's Identity

The Free Speech Clause protects all persons within all places in United States territory. *Tinker v. De Moines Ind. Community School Dist.*, 393 U.S. 503, 513 (1969). The clause is a negative proscription against the United States government, not a positive grant of rights to a select few speakers. U.S. Const. Amend. I ("Congress shall make no law . . . abridging the freedom of speech . . . ."). In free speech cases, "[t]he proper

question [] is not whether [the plaintiffs] 'have' First Amendment rights . . . . Instead, the question must be whether [the government] abridges expression that the First Amendment was meant to protect." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 776 (1978).

Free speech doctrine is not speaker-based. "The identity of the speaker is not decisive in determining whether speech is protected." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 342 (2010) (quoting *Pacific Gas & Elec. Co.*, 475 U.S. at 8 (plurality opinion)); *accord Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 48 n.4 (Stevens, J., dissenting); *Bellotti*, 435 U.S. at 784–86. The very core of free speech protection is that "[t]he Government may not . . . deprive the public of the right and privilege to determine for itself what . . . speakers are worthy of consideration." *Id*. at 341. The protection for any given act of expression cannot vary based on the speaker's identity. *Id.* at 342; *Pacific Gas & Elec. Co.*, 475 U.S. at 8; *Bellotti*, 435 U.S. at 776–77. Because the Plaintiffs' expression in this case is undoubtedly political speech made within the United States, that speech is protected, regardless of the status of the Plaintiffs' asylum applications.

The Supreme Court has repeatedly recognized the danger of accepting  argument for a speaker-based conception of free speech rights. "[S]peech restrictions based on the identity of the speaker are all too often simply a means to control content." *Citizens United*, 558 U.S. at 339–340 ("[The] purpose and effect [of a speaker-based distinction] are to silence entities whose voices the Government deems to be suspect"); *Austin v. Mich. Chamber of Commerce*, 494 U.S. 652, 700 (1990) (Kennedy, J., dissenting), *overruled by Citizens United*, 558 U.S. at 310 ("[D]istinctions based upon both the

speech and the speaker . . . [are] the rawest form of censorship."); *Bellotti*, 435 U.S. at 784–86 ("[D]ictating . . . the speakers who may address a public issue . . . is unacceptable . . . [e]specially where . . . suppression of speech suggests an attempt to give one side of a debatable public question an advantage"). The Supreme Court has also rejected a speaker-based approach to free speech doctrine because speech is more than an instrumental contribution to public debate; it is an essential component of human self-fulfillment: "By taking the right to speak from some and giving it to others, the Government deprives the disadvantaged person or class of the right to use speech to strive to establish worth, standing, and respect for the speaker's voice." *Citizens United*, 558 U.S. at 340.

For these reasons, the Court has made clear that "[t]he inherent worth of . . . speech in terms of its capacity for informing the public does not depend upon the identity of its source." *Bellotti*, 435 U.S. at 777. Here, GEO impermissibly argues that Plaintiffs' speech regarding their conditions of detention, which is unquestionably worthy of protection under the First Amendment, loses that protection solely because of the Plaintiffs' immigration status. Fed. Def. Mot. at 12. The Supreme Court has repeatedly and explicitly rejected this approach to free speech rights. *Citizens United*, 558 U.S. at 310 (invalidating ban on political speech based on identity of speaker); *Wisconsin Right to Life*, 551 U.S. at 449 (invalidating law banning funding of campaign speech based on identity of speaker); *Bellotti*, 435 U.S. at 784 (invalidating law banning political contributions by speakers not materially affected by the relevant issue); *Pacific Gas & Elec. Co.*, 475 U.S. at 8 (plurality opinion) (invalidating legal order that government contractor express a point of view).

Moreover, the Court should be particularly skeptical of a doctrinal argument that would result in complete lack of protection for speech the government wishes to suppress. The government sought to abridge Plaintiffs' speech criticizing immigration detention policies. The Supreme Court has made it clear that free speech doctrine counsels in favor of strong protection when the government tries to silence speech about its own activities. *Reed v. Town of Gilbert*, 135 S.Ct. 2218, 2231 (2015) (quoting *Turner Broadcasting Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994)) ("[F]avoring some speakers over others demand[s] strict scrutiny when the [] speaker preference reflects a content preference."); *Snyder v. Phelps*, 131 S.Ct. 1207, 1215 (2010) (quoting *Connick v. Myers*, 461 U.S. 138, 145 (1983)) (holding that speech about government action "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection"); *Turner*, 512 U.S. at 642 ("[S]peaker-based laws demand strict scrutiny when they reflect the Government's . . . aversion to what the disfavored speakers have to say."). Plaintiffs' speech in opposition to the government's family detention policy is clearly "expression that the First Amendment was meant to protect," which is the controlling question according to free speech doctrine. *Bellotti*, 435 U.S. at 776 ("In free speech cases, "[t]he proper question [] is not whether [the plaintiffs] 'have' First Amendment rights . . . . Instead, the question must be whether [the government] abridges expression that the First Amendment was meant to protect.").

This approach accords with the historical understanding of the First Amendment rights of noncitizens on United States soil. There is abundant evidence that, at the time of the framing, the right to petition was commonly exercised by noncitizens such as disenfranchised white males (prisoners and those without property), women, free

African-Americans, Native Americans, and immigrants. Michael J. Wishnie, *Immigrants and the Right to Petition*, 78 N.Y.U. L. Rev. 667, 689, 699–700 (2003). Rules adopted by the House and Senate in the First Congress contained no alienage classification or other limitations on the right to petition; Congress heard multiple petitions from refugees during the earliest years of the United States, and while there were many objections to those petitions, the petitioners' immigration statuses were not among them. *Id.* at 699–711. James Madison, "universally recognized as the primary architect of the bill of rights," wrote that "as [aliens] owe, on one hand, obedience [to the laws], they are entitled, in return, to their protection and advantage." *United States v. Verdugo-Urquidez*, 494 U.S. 259, 284 (1990) (Brennan, J., dissenting) (quoting Madison's Report on the Virginia Resolutions (1800), reprinted in 4 Elliot's Debates 556 (2d ed. 1836)).

For more than a century, courts have recognized that persons who are present in the territorial United States—including immigrants who are in the United States without legal authorization—are entitled to equal protection of the laws (*Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886)), to due process of law before deprivation of life, liberty, or property (*Yamataya v. Fisher*, 189 U.S. 86 (1903); *Wong Wing v. United States*, 163 U.S. 228, 242 (1896); *Yick Wo*, 118 U.S. at 369), to basic rights in a criminal prosecution (*Wong Wing*, 163 U.S. at 242), to petition for writ of habeas corpus (*see, e.g.*, *Yamataya*, 189 U.S. at 86; *Wong Wing*, 163 U.S. at 228) and to freedom from slavery and involuntary servitude (*Wong Wing*, 163 U.S. at 228). *Accord Ibrahim v. Dep't of Homeland Security*, 669 F.3d 983, 994 (9th Cir. 2012) ("Even aliens who are in the United States illegally may bring constitutional challenges."). There is no persuasive historical reason to treat free speech different than these other fundamental rights.

Wishnie, 78 N.Y.U. L. Rev. at 684 (arguing originalism cannot limit immigrants' rights in light of the "rich historical evidence" that framers of the First Amendment intended its application to all persons present in the nation); Maryam Kamali Miyamoto, *The First Amendment After Reno*, 35 Harv. C.R.-C.L. L. Rev. 183, 188 (2000).

GEO's counterargument relies on *Johnson v. Eisentrager*, 339 U.S. 763 (1950), a case that concerned the constitutional rights of Nazi spies serving sentences in Germany for war crimes. GEO quotes dicta from *Eisentrager* stating that lawful presence in the United States triggers "certain rights." 339 U.S. at 770. Based on this passage alone, GEO implies that lawful presence in the United States is *necessary* to trigger free speech protection. This argument misrepresents the holding of *Eisentrager* altogether. *Eisentrager* applied to a narrow question about the availability of constitutional rights for enemy aliens outside the territory of the United States. The Court was careful to emphasize that the petitioners' constitutional rights depended on both the petitioners' status as "enemy aliens" and the fact that the petitioners were outside the territory of the United States. *Accord Servicios Azucareros de Venezuela, C.A. v. John Deere Thibodeaux, Inc.*, 702 F.3d 794, 804 (5th Cir. 2012) (holding *Eisentrager* does not affect the rights of nonresident friendly aliens). By contrast to the prisoners in *Eisentrager*, Plaintiffs are "friendly aliens" within the territory of the United States. Moreover, *Eisentrager* cites approvingly to cases indicating that people *unlawfully* present in the United States have constitutional rights. *Id.* at 770–71 (citing *United States ex rel. Vajtauer v. Comm'r of Immigration*, 273 U.S. 103 (1927) (holding undocumented immigrant entitled to due process and entertaining his petition for writ of habeas corpus);

*Yamataya*, 189 U.S. at 86 (same)). *Eisentrager* does not support GEO's position that free speech protection depends on immigration status.

GEO further relies on *United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990), which concerns the right of an alien living outside the United States to challenge a search of his home, also outside the territory of the United States. GEO again quotes dicta, arguing that constitutional rights qualified by the phrase "the people" protect only those people with sufficient connections to the United States such that they are part of the national community. GEO. Mot. at 9–10. These dicta—which Justice Kennedy disclaimed in his concurrence[4]—are of no consequence to the Plaintiffs' free speech claim. The Free Speech Clause is not qualified by the phrase "the people."[5] The Free Speech Clause does not confer an affirmative right; it restricts the government from interference with protected speech. The government claims that the scope of the Free Speech Clause depends on an interpretation of "the people," but this argument is textually incorrect. *Accord United States v. Portillo-Muñoz*, 643 F.3d 437, 443 (5th Cir. 2011) (Dennis, J., concurring in part and dissenting in part) (listing only Petition and Assembly Clauses as First Amendment rights of "the people"); *Underwager v. Channel 9 Austl.*, 69 F.3d 361, 365 (9th Cir. 1995) ("Only [] in the latter part . . . does [the First Amendment] refer to 'the right of the people.' [T]here is no expressed limitation as to whom the right of free speech applies.").

---

[4] "I cannot place any weight on the reference to 'the people' in the Fourth Amendment as a source of restricting its protections. With respect, I submit these words do not detract from its force or its reach." *United States v. Verdugo-Urquidez*, 494 U.S. at 276 (Kennedy, J., concurring).

[5] The plain text of the First Amendment qualifies only the rights to petition and assemble as rights of "the people." U.S. Const. Art. I.

Moreover, applying *Verdugo*'s "sufficient connections" dicta in the free speech context effectively requires Plaintiffs to demonstrate a personal interest, such as an interest in our country's affairs, that is sufficiently great to merit free speech protection. In *Bellotti*, the Supreme Court rejected a law that conditioned free speech protection on a "requirement that the speaker have a sufficiently great interest in the subject to justify communication." *Bellotti*, 435 U.S. at 784. So long as plaintiffs' speech is worthy of protection, neither their immigration status nor their "interest" in that speech, as evidenced by connections to the country, can deprive the speech of First Amendment protection.

This careful analysis of whether *Verdugo* applies in the free speech context comports with the Fifth Circuit's warning in *Portillo-Muñoz*, 643 F.3d at 440–41, that *Verdugo* cannot be imported wholesale to determine the application of any constitutional right. Instead, courts must consider the text and purpose of the constitutional provision at issue. *Id.* (discussing text, history, and purpose of different provisions: "Attempts to precisely analogize the scope of these two amendments is misguided [sic]."). Here, in the complete absence of the words "the people" and against a doctrinal backdrop forbidding speaker-based analysis, *Verdugo*'s sufficient connections test does not apply.

Finally, GEO relies on *United States ex rel. Turner v. Williams*, 194 U.S. 279 (1904), to suggest that undocumented immigrants have no free speech rights. *Turner* concerns the scope of the government's "plenary power" to exclude or expel an anarchist noncitizen, a power not at issue here. The power to exclude noncitizens is plenary: "over no conceivable subject is the legislative power of Congress more complete." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S.

320, 339 (1909)). It is a "fundamental sovereign attribute" of self-preservation. *Id.* (citing, *inter alia*, *Chae Chan Ping v. United States* (*The Chinese Exclusion Case*), 130 U.S. 581 (1889)). Whatever the scope of the plenary power to exclude noncitizens, that power is not at issue here.

The *Turner* Court relied heavily on cases discussing this power and permitted the government to deport the petitioner, not because he lacked free speech rights, but because judicial review of the government's power to choose reasons to exclude noncitizens was (at the time) extremely limited. *Turner*, 194 U.S. at 294 ("We are not to be understood as depreciating the vital importance of freedom of speech . . . , but this case does not involve those considerations. . . . [A]s lon[g] as human governments endure they cannot be denied the power of self-preservation, as that question is presented here."). Notably, the Court suggested that if the law at issue explicitly abridged the petitioner's right to free speech, it would be unconstitutional. *Turner*, 194 U.S. at 292.[6] In other words, while the government has plenary power to exclude noncitizens (perhaps even for speech-related reasons), it remains unconstitutional for the government to abridge the free speech rights of undocumented immigrants in other contexts. *Accord* Miyamoto, 35 Harv. C.R.-C.L. L. Rev. at 193 ("[I]n nonexclusion and nondeportation contexts, U.S. law has generally protected aliens' speech from punishment using the same standards that apply to citizens . . . .").

---

[6] *Turner* predated passage of the Espionage Act of 1917 and the development of modern First Amendment jurisprudence, including the concepts of retaliation and chilling free speech. Without the benefit of those doctrinal developments, the *Turner* Court simply asked whether the act in question explicitly referenced abridgement of free speech. *Id.* at 292.

Later Supreme Court decisions have confirmed this view that *Turner* does not permit limitless governmental interference with undocumented immigrants' free speech. The Supreme Court has repeatedly observed that "freedom of speech and of press is accorded aliens residing in this country." *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 497 (1999) (Ginsburg, J., concurring) (quoting *Bridges v. Wixon*, 326 U.S. 135, 148 (1945)). Since the government's exclusionary power is not at issue in this case, *Turner* does not apply to foreclose Plaintiffs' free speech rights.

Neither *Eisentrager*, nor *Verdugo-Urquidez*, nor *Turner* supports the contention that the government may abridge free speech of people within the United States. The Court should reject GEO's bid to use immigration status to dismantle the application of the Free Speech Clause to all persons within the United States.

### b. GEO's Proposed Test for Free Speech Rights Is Unworkably Vague and Impermissibly Chills Free Speech

Even if the Court were to permit the government to retaliate against some immigrants present in the United States, GEO's proposed test for determining which of those immigrants have free speech rights is unworkable. It is impossible for immigrants to determine in advance whether they have "sufficient connections" to the United States that merit the protection of the Free Speech Clause. This test would unconstitutionally chill the speech of immigrants who are, in fact, protected by the Free Speech Clause.

"First Amendment freedoms need breathing space to survive." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 433 (1963) (citing *Cantwell v. Connecticut*, 310 U.S. 296, 311 (1940)). When delineating the scope of activity protected by the First Amendment, courts must be even more stringent about vagueness than they would be in other contexts. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010)

(citing *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495 (1982));
*Smith v. Goguen*, 415 U.S. 566, 573 & n.10 (1974). This is because First Amendment
freedoms are "delicate and vulnerable"; the threat of sanctions undermines free speech
nearly as much as actual sanctions. *Button*, 371 U.S. at 433 (citing *Smith v. California*,
361 U.S. 147, 151–54 (1949); *Speiser v. Randall*, 357 U.S. 513, 525 (1958)). To avoid
chilling protected speech, the government may regulate in the First Amendment context
with only "narrow specificity." *Button*, 371 U.S. at 433.

These principles apply with equal strength to judicial decisionmaking: "Courts,
too, are bound by the First Amendment." *Citizens United*, 558 U.S. at 326–27. Courts
must avoid articulating standards that "create an inevitable, pervasive, and serious risk of
chilling protected speech pending the drawing of fine distinctions that, in the end, would
themselves be questionable." *Id.* A speaker's ability to communicate a time-sensitive
message—like the message urging her and her children's release from detention—is
"stifled if the speaker must first commence a protracted lawsuit." *Id.* at 334. Courts are
therefore required to "eschew the open-ended rough-and-tumble of factors which invites
complex argument in a trial court and a virtually inevitable appeal." *Id.* at 326–27
(quoting *Wisconsin Right to Life*, 551 U.S. at 469; *Jerome v. Grubart, Inc. v. Great Lakes
Dredge & Dock Co.*, 513 U.S. 527, 547 (1995)) (alterations and internal quotation marks
omitted). The Court has also described such balancing tests as "startling and dangerous,"
admonishing that "[t]he First Amendment's guarantee of free speech does not extend only
to categories of speech that survive an ad hoc balancing of relative social costs and
benefits. The First Amendment itself reflects a judgment by the American people that the

benefits of its restrictions on the Government outweigh the costs." *United States v. Stevens*, 559 U.S. 460, 470 (2010).

The "sufficient connections" test is a perfect example of the disfavored, open-ended and "highly manipulable" balancing test. *Stevens*, 559 U.S at 472. Requiring each asylum-seeker in the government's custody to guess about her ability to demonstrate the sufficiency of her connections to this country—an extremely complex inquiry with few limitations—would fundamentally undermine whatever right she may have to timely and directly express her opposition to her and her family's detention. The government's proposal is simply inconsistent with a meaningful right to free speech.

Moreover, contrary to GEO's intimation, no Fifth Circuit precedent requires this Court to apply the sufficient connections test. In *Portillo-Muñoz*, 643 F.3d at 437, the Fifth Circuit specifically warned that *Verdugo* should not be imported wholesale to determine the application of any constitutional right. Instead, courts must consider the text and purpose of the constitutional provision at issue. *Id.* at 440–41 (discussing text, history, and purpose of different provisions: "Attempts to precisely analogize the scope of these two amendments is misguided [sic]."). Therefore, decisions about the scope of the Second Amendment, *id.*, or the Fourth Amendment, *Hernandez v. United States*, 785 F.3d 117, 119 (5th Cir. 2015), are not dispositive of the scope of the Free Speech Clause. To the contrary, Fifth Circuit precedent requires the Court to conduct an independent analysis of the scope of the right to free speech.

Because free speech protection is not limited to "the people," and against a doctrinal backdrop forbidding both speaker-based analysis and manipulable multifactor

tests, the Court should not use a sufficient connections test to analyze undocumented immigrants' free speech protection.

<blockquote>
c.      **In the Alternative, If the Court Applies The Sufficient Connections Test, Plaintiffs' Connections to the United States Are Sufficient to Merit Free Speech Protection**
</blockquote>

If the Court were to use a sufficient connections test to determine the free speech rights of putative class members, the only workable bright-line determination would be to find that all class members (mothers in family detention at Karnes) have free speech rights, regardless of their immigration status. Drawing the line anywhere else would either chill free speech by inviting complex litigation or deny protection of the Free Speech Clause to mothers who have sufficient connections to the United States.

The class members have many connections to the United States, and those connections are sufficient to merit free speech protection. "Sufficient connections" under *Verdugo* depend on the historical purpose of the right at issue. 494 U.S. at 266–67. Historically, the Free Speech Clause was designed to bar the federal government from restricting speech within the United States. *Smith v. California*, 361 U.S. 147, 158 n.2 (1959) (Black, J., concurring) (describing "absolutism" of founding fathers and citing, *inter alia*, 1 Annals of Cong. 738 (1789) (commentary by James Madison); 8 Thomas Jefferson, *The Works of Thomas Jefferson*, 464–65 (P. Ford ed. 1904); 1 William Blackstone, Commentaries 299 (Tucker ed. 1803)); *Columbia Broadcast Sys. v. Democratic Nat'l Comm.*, 412 U.S. 94, 156–57 (1973) (Douglas, J., concurring) (describing Thomas Jefferson's absolutist view and citing 4 J. Elliot's Debates on the Federal Constitution 541 (1876); 15 Thomas Jefferson, *The Works of Thomas Jefferson* 214 (P. Ford ed. 1904); 14 *id.* at 116; 11 *id.* at 43–44). Political speech was, historically, the primary object of free speech protection. *Nixon v. Shrink Missouri Government PAC*,

528 U.S. 377, 410–411 (2000) (Thomas, J., dissenting) (citing, *inter alia*, Thomas M. Cooley, Constitutional Limitations *422 (5th ed. 1883); Zechariah Chafee, Free Speech in the United States 28 (1954); Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 Ind. L.J. 1, 20 (1971); Cass R. Sunstein, *Free Speech Now*, in The Bill of Rights in the Modern State 304–307 (G. Stone, R. Epstein, & C. Sunstein eds. 1992)). Finally, because the Free Speech Clause is textually a limitation on government conduct, rather than an affirmative right, the Fifth Circuit has recognized a lower threshold for noncitizens to demonstrate that they are members of the presumptively broad class protected by the right. *Portillo-Muñoz*, 641 F.3d at 441.

Based these historical purposes of the Free Speech Clause and the text of the clause itself, extending the Plaintiffs free speech protection on the basis of their connections to the United States would further the purpose of free speech protection.

First, the putative class members are connected to the United States by their presence within the United States. *Verdugo* indicates that presence in the United States is a strong factor implying sufficient connection to this country. The *Verdugo* Court characterized its "sufficient connections" test as consistent with prior precedent, citing a passage from *Plyler* and *Yick Wo* to emphasize that "[t]he provisions of the Fourteenth Amendment 'are universal in their application, *to all persons within the territorial jurisdiction . . . .*'" *Verdugo*, 494 U.S. at 271 (quoting *Plyler*, 457 U.S. at 212; *Yick Wo*, 118 U.S. at 369) (emphasis in original). The *Verdugo* court again emphasized the importance of physical presence in the country during its discussion of a prior case that upheld the Fourth Amendment rights of an undocumented immigrant. *Id.* at 273. Because Plaintiffs are present in the United States, there is no worry here—as there was in

*Verdugo*—that Plaintiffs' argument implies geographically unlimited application of free speech rights in a way that may interfere with military operations. *Id.* at 273–74. Unlike the defendant in *Verdugo*, all class members were and are in the United States at the time they are asserting the protection of the Free Speech Clause. It would further the traditional purpose of the Free Speech Clause to protect speech occurring within the United States.

Second, class members voluntarily initiated connections with the United States. Unlike the defendant in *Verdugo*, mothers in family detention all traveled to the United States, actively seeking to join the national community, and obtain permanent refuge here. *Id.* at 271 (noting that defendant had "no previous significant voluntary connection with the United States"). The class members almost universally seek asylum or permanent withholding of removal from the United States. Like class members, the named Plaintiffs have attested to their desire to remain in the United States permanently. One of them has already won permanent withholding of removal. Another had lived in the United States for many years and has a U.S. citizen son. Unlike the defendant in *Verdugo*, immigrants in family detention voluntarily initiated connections with the United States before asserting the protection of the Free Speech Clause.

Class members who seek to vindicate their free speech rights are making a genuine attempt to participate in United States society and our political process. The free speech clause expresses a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder*, 131 S.Ct. at 1215 (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)). Speech about government action "occupies the highest rung of the hierarchy of First Amendment

values, and is entitled to special protection." *See id.* (quoting *Connick*, 461 U.S. at 145).
People who seek the protection of an injunction in this case have embraced our country's
commitment to uninhibited and robust debate about the actions of our government.[7] In
the context of free speech rights, this connection to the United States is substantial: it
occupies the highest rung of the hierarchy of values the Free Speech Clause is intended to
protect.

Finally, class members are in the custody of the United States government. By
virtue of being in the government's custody and subject to the control of the government
in all aspects of their daily lives, the Plaintiffs' connection to the actions of the United
States government is immediate and intimate. Detention in the custody of the United
States is a connection that counsels especially strongly in favor of free speech protection:
allowing these families to speak without fear would further our historical commitment to
robust and well-protected democratic debate about the actions of our government.
*Snyder*, 131 S.Ct. at 1215; *Connick*, 461 U.S. at 145; *N.Y. Times Co. v. Sullivan*, 376 U.S.
at 270.   Affording free speech protection while Plaintiffs are detained also helps to
protect the integrity of the Court and the Free Speech Clause. Conditioning free speech
rights on immigration status would give "political branches [] the power to switch the
Constitution on or off at will," essentially permitting the government to decide when

---

[7] Women and children released from family detention have testified before Congress, met
with federal officials, and agreed to interviews with reporters to contribute to the national
conversation about the nature and consequences of family detention. While it is
Plaintiffs' position that no one in United States territory is required to "earn" free speech
protection, many of these families have a genuine commitment to facilitating public
discourse.

Plaintiffs are entitled to free speech protection.[8] *Boumediene v. Bush*, 533 U.S. 723, 765 (2008). Such an arrangement would permit "Congress and the President, not this Court, say 'what the law is,'" *id.* (quoting *Marbury v. Madison*, 1 Cranch 137, 177 (1803)), which is antithetical to the historical function of the Free Speech Clause. For these reasons, Plaintiffs' connection to the United States through their detention in a secured government facility weighs heavily in favor of free speech protection.

Altogether, these connections to the United States are sufficient to warrant protection of the Free Speech Clause for people in family detention. Upholding free speech protection for this group of detainees would further the historical purpose of the Free Speech Clause.

### 2.   GEO's Actions Were Substantially Motivated Against Plaintiffs' Expressive Conduct

A defendant's actions are "substantially motivated against" protected First Amendment activity if the actions are intended to deter further expression. It is irrelevant whether there is a conceivable justification for the defendant's actions: "An action motivated by retaliation for the exercise of a constitutionally protected right is actionable, even if the act, when taken for a different reason, might have been legitimate." *Woods v. Smith*, 60 F.3d 1161, 1165 (5th Cir. 1995). The question is whether the actual motivation for the government's actions was retaliatory. *Id.* Because direct proof of a mental state is rare, pleading this element requires only that a plaintiff "allege a chronology of events

---

[8] If noncitizens' free speech rights were dependent upon their detention status, or the status of their asylum applications, their rights would be in the unilateral control of the government, which could delay their applications and continue to keep them in detention solely to prevent them from exercising free speech rights. As explained above, this result is fundamentally inconsistent with the history, purpose and function of the First Amendment.

from which retaliation may plausibly be inferred." *Bibbs v. Early*, 541 F.3d 267, 272–73 (5th Cir. 2008) (quoting *Woods*, 60 F.3d at 1166).

In this case, it is plausible to infer that the actual motive for GEO's actions was retaliatory. Plaintiffs allege a chronology supporting the reasonable conclusion that GEO wanted to suppress their message. Major points in this chronology are as follows: within hours of the petition leaving the facility, GEO supervisors forced all mothers who had signed the petition to sit in a room with multiple supervisors and endure threats that their children would be taken away and sent to another detention facility. GEO supervisors also interrogated, insulted, and intimidated one mother who had collected signatures. Two other mothers whom GEO perceived to be associated with the petition were locked into solitary confinement overnight with their children; GEO employees gave many different explanations for this confinement, but they did not plausibly indicate that the confinement was for anything other than punishment for their speech. In fact, a GEO guard explicitly told one mother that she was being punished. After these mothers were released from isolation and some strikers continued to refuse meals, GEO fired every single mother who was still participating in the strike. At the same time, GEO raised the prices in the commissary, making it more difficult for striking mothers to feed their children. GEO also threatened striking mothers with deportation, videotaped them at an intrusive range, and falsely charged them with attempted escape by helicopter after they expressed opposition to the videotaping. After the first strike was suspended, when a much smaller group of mothers began a second hunger strike, GEO again compelled the mothers to attend a meeting where they were required to compose signed statements about the strike and endure threats that their children would be taken away. GEO staff

repeatedly threatened to "lock [] up" the small group of mothers who persisted in their strike until the very end. This chronology supports a plausible inference that GEO's conduct was motivated against the hunger strike. *Accord Ward v. Fischer*, __ Fed. App'x __, 2015 WL 3609507, *3 (5th Cir. 2015) (holding chronology supported plausible inference despite lapse of more than a month between filing grievance and retaliatory act), *Bibbs*, 541 F.3d at 273–74 (holding plausible inference despite lapse of a month); *Woods*, 60 F.3d at 1162–63 (holding plausible inference despite lapse of three days); *Hart v. Hariston*, 343 F.3d 762, 763 (5th Cir. 2003) (per curiam) (holding plausible inference despite lapse of "days").

GEO's sole argument to the contrary is that GEO employees merely attempted to avert the potential "disturbance" caused by mothers passively refusing meals. This pretext is unpersuasive, but, more importantly, this pretext is irrelevant. The question is whether, drawing all reasonable inferences in the Plaintiffs' favor, it is plausible to conclude that GEO's goal was to retaliate against the striking mothers for their expression. GEO's argument invites the Court to draw the inferences *against* the Plaintiffs, defer to institutional officials, and charitably assume that maintenance of order was GEO's sole purpose. When applying the proper standard, however, and drawing inferences in the Plaintiffs' favor, it is reasonable to infer from GEO's entire course of conduct that its intention was not merely to maintain order, but also to retaliate.

For this reason, the applicability of *Turner v. Safley*, 482 U.S. 78 (1987), is also irrelevant. As Plaintiffs explained in prior briefing, *Turner* held that prison regulations may impinge on prisoners' constitutional rights if they are reasonably related to legitimate penological interests. Civil immigration detainees such as Plaintiffs have not

been accused or convicted of any crime, their detention is not penal, and they have had no criminal proceeding, and so their detention is fundamentally different from detention in a jail (and certainly prison). *Zadvydas*, 533 U.S. at 690–96. Plaintiffs are unaware of any decision by the Supreme Court or the Fifth Circuit holding that *Turner* applies to immigration detention.[9]

Even if *Turner* applied to Plaintiffs' claims, it would not justify GEO's conduct. *Turner* operates to protect only those government actions pursuant to preexisting regulations with a reasonable relationship to a legitimate penological interest. It is reasonable to infer that many of GEO's specific retaliatory acts were not in accordance with any preexisting regulation—no such regulation is described in the complaint, and tellingly, GEO has not claimed that it acted in accordance with any regulation explicitly permitting its many retaliatory acts. Moreover, it is reasonable to infer that GEO's motive was to punish protected speech, not to further any legitimate penological interest. GEO's tactics—repeated group meetings with multiple supervisors, transferring detainees' belongings for overnight stays in other rooms, firing dozens of mothers from their jobs, changing prices in the commissary, videotaping mothers and children, threatening to deport or separate families—hardly promoted an orderly environment at Karnes. As the Plaintiffs' allegations make clear, their acts of protest and expression were peaceful and did not undermine the order of the Karnes facility in any way. Compl. ¶¶ 37–44. The

---

[9] GEO claims in a footnote, without any analysis, that *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 243–45 (1983), holds that family detention is "equivalent to" pretrial detention. This claim is incorrect; the case does not describe immigration detention or standards for any type of custody other than pretrial detention.

Court must draw the reasonable inference in Plaintiffs' favor that GEO lacked any legitimate, non-retaliatory basis for its actions.

Furthermore, *Turner* held that a prison's regulation is invalid if there are "obvious, easy" alternatives to the regulation, demonstrating that the prison had an exaggerated response to its concerns. 482 U.S. at 90. Here, the obvious, easy alternative is for GEO to refrain from isolating and firing protesting mothers, and to cease threatening mothers with child separation unless they are, in fact, at imminent risk of losing their children.  In short, *Turner* calls for GEO to justify its behavior with evidence of a preexisting, valid prison regulation, and GEO cannot satisfy that standard before the summary judgment stage.

**3.     GEO's Actions Would Deter a Person of Ordinary Firmness from Expressing Opposition to Her Family's Detention**

Retaliatory action violates First Amendment rights if the action is capable of deterring a "person of ordinary firmness" from further exercise of her rights. *Morris v. Powell*, 449 F.3d 682, 686 (5th Cir. 2006); *Keenan v. Tejada*, 290 F.3d 252, 259 (5th Cir. 2002). This *de minimis* threshold "is intended to weed out only inconsequential actions and is not a means to excuse more serious retaliatory acts." *Morris*, 449 F.3d at 686.

GEO's brief misstates many aspects of this standard. First, GEO incorrectly asserts that Plaintiffs must demonstrate an "atypical and significant hardship" to state a constitutional claim, citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Mot. to Dismiss at 17. *Sandin* is premised on the fact that a prison sentence necessarily extinguishes some of a prisoner's liberty, and as a result, he does not have a right to due process before being locked in solitary confinement unless he is locked away for a period that is an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life."

36

512 U.S. at 484. The *Sandin* standard is clearly inapplicable to Plaintiffs: they have not been convicted of any crime, and they do not assert any claim under the Due Process Clause. *See Tilmon v. Prator*, 368 F.3d 521, 523 (5th Cir. 2004) (holding that *Sandin* applies upon adjudication of guilt).

Second, GEO incorrectly asserts that retaliation takes place only if the plaintiff was actually scared out of further speech or litigation. Mot. to Dismiss at 15–16. If this were the case, it would be impossible to win a retaliation claim, because anyone brave enough to litigate would fail to satisfy the standard.[10] The question is instead how an *ordinary* person would feel, and whether that ordinary person would feel *deterred*. *Keenan*, 290 F.3d at 259 ("The question, to repeat, is whether a person of ordinary firmness would have been deterred . . . we hold that the actions of the defendants in this case . . . are sufficiently intimidating to chill the speech of a person of ordinary firmness.").

Third, nearly all of GEO's citations regarding deference to prison administrators concern the level of scrutiny to be applied to a preexisting prison policy designed by experts. *Stauffer v. Gearhart*, 741 F.3d 574, 584 (5th Cir. 2014) (collecting many deference quotations cited by GEO). Deference to the expertise of prison policymakers is

---

[10] For this reason, Plaintiffs urge the Court to write in respectful disagreement with the holding in *Vogel v. Brewer*, 2014 WL 6751173, *8 (S.D. Tex. Dec. 1, 2014), that a retaliatory assault is constitutional if the victim is formidable enough to persist with his speech.

not appropriate in the case of lower-level officials' ad hoc responses to behavior that they dislike.

Fourth and finally, GEO incorrectly asserts that "many acts that would not be de minimis outside of a detention facility are within it, where restrictions are permitted." Mot. to Dismiss at 13. This is a conceptual mistake. Being inside a detention center does not make a government agent's actions any less intimidating. GEO apparently intended to argue that legitimate penological interests may justify retaliation, a point that speaks to the motivation for GEO's actions and not the effect those actions would have on an ordinary detainee. This argument is discussed above in III(B)(2), the "substantially motivated" section.

Having cleared away the brush, the legal standard that applies is this: whether GEO's actions would deter a person of ordinary firmness from striking, or whether GEO's actions were merely inconsequential. Despite GEO's argument to the contrary, confinement in isolation is certainly not inconsequential. Even in the prison context, where courts sanction more intrusive limitations on prisoners' civil liberties, the Fifth Circuit has held that placement in segregation is sufficiently serious to constitute retaliation, *Cruz v. Beto*, 603 F.2d 1178, 1185–86 (5th Cir. 1979), as is a punishment of commissary and cell restrictions for twenty-seven days, *Hart*, 343 F.3d at 764.[11]

---

[11] First Amendment cases litigated in the prison context are not directly applicable to this case. In light of a prisoner's criminal conviction and sentence to imprisonment, prisons may place reasonable limitations on her civil liberties. *Turner v. Safley*, 482 U.S. 78 (1987). Plaintiffs, however, have not been convicted of a crime, nor even charged with a crime. They and their children are in civil immigration detention, which is entirely nonpunitive. *Zadvydas v. Davis*, 533 U.S. 678, 690–696 (discussing "important constitutional limitations" on immigration detention, which is appropriate only under "special and narrow nonpunitive circumstances") (quotation marks and citations omitted).

Threats, as well as actions, must be considered to determine the deterrent effect of the defendant's retaliation. The Fifth Circuit has held that "even a *threat*[] . . . can be a potent means of chilling the exercise of constitutional rights." *Click v. Copeland*, 970 F.2d 106, 109 (5th Cir. 1992) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 574 (1968)); *accord Izen*, 398 F.3d at 367 n.5 (discussing "threat[]" as retaliation); *Keenan*, 290 F.3d at 259 (collecting cases holding that "concrete intimidating tactics" can "deter[] ordinary persons from criticizing government officials"). The question is the same for threats as for adverse action: whether the threat would deter a person of ordinary firmness. *Keenan*, 290 F.3d at 259 (discussing officers detaining plaintiffs for an "inordinate period of time" with guns drawn: "The question, to repeat, is whether a person of ordinary firmness would have been deterred by these ominous events").[12]

The deterrent effect of defendants' actions should be considered in the aggregate because a person who exercises her First Amendment rights does not encounter the defendant's retaliatory acts piecemeal. To understand the actual deterrent effect of the defendant's acts, the Court must consider how an ordinary person would react to the

---

[12] Other circuits agree that threats by themselves are sufficient to violate the First Amendment if they would deter a person of ordinary firmness. *Hutchins v. Clarke*, 661 F.3d 947, 956 (7th Cir. 2011) (holding First Amendment violation may result "where the defendant's speech is threatening, harassing, or intimidating"); *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010) (asking whether "threat is capable of deterring a person of ordinary firmness"); *Brodheim v. Cry*, 584 F.3d 1262, 1270 (9th Cir. 2009) (asking whether statements can be interpreted as "intimating that some form of punishment or adverse regulatory action would follow"); *Suarez Corp. Inds. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000) (discussing "threat[s], coercion, or intimidation intimating that punishment, sanction, or adverse regulatory action will imminently follow"); *Suppan v. Dadonna*, 203 F.3d 228, 233 (3d Cir. 2000) (considering threats); *Levin v. Harleston*, 966 F.2d 85, 90 (2d Cir. 1992) ("[T]he threat of discipline implicit in [the defendant's] actions was sufficient to create a judicially cognizable chilling effect").

defendant's entire course of conduct. *See Breaux v. City of Garland*, 205 F.3d 150, 160 (5th Cir. 2000) (discussing claims based on actions in the aggregate and a "campaign of retaliatory harassment"). *See also Bennett v. Hendrix*, 423 F.3d 1247, 1254–55 (11th Cir. 2005) ("[R]eadily conclud[ing]" that campaign of harassment by police officers was sufficient); *Wallace v. Benware*, 67 F.3d 655, 663 (7th Cir. 1995) (upholding liability for "campaign of petty harassment"); *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982) (Posner, J.) (sustaining claim about "an entire campaign of harassment which though trivial in detail may have been substantial in gross"). Even if "the [deterrent] effect on freedom of speech is small, since there is no justification for harassing people exercising their constitutional rights[,] it need not be great in order to be actionable." *Bart*, 677 F.2d at 625 (Posner, J.); *see also Keenan*, 290 F.3d at 259 (quoting the same).

GEO's sustained threats and harassment of the striking mothers would deter a person of ordinary firmness from continuing with her strike. The hunger strikers at Karnes are mothers, and they face the impossible task of caring for and nurturing their children in a secure detention facility. The majority of GEO's tactics—firing striking mothers from their jobs, invasively videotaping children, raising prices at the commissary, and threatening to lock children in isolation with their mothers—have the effect of interfering with the striking mothers' ability to care for their children inside Karnes. A person of ordinary firmness would feel deterred by losing the few comforts she could provide to her child during prolonged detention in a prison-like setting.

Even the most resolute striking mothers felt deterred by GEO's actions. Two striking mothers were terrified when their children were locked into an isolation cell with them overnight, and a third striking mother was terrified by repeated interrogations,

confinement in isolation, and threats to confine her daughter in the same way. GEO argues that the Plaintiffs' subjective fear is irrelevant, but these allegations provide a sound basis for inferring that the other mothers who stopped striking did so out of fear. Many striking mothers dropped out of the strike completely after they learned that children and their mothers were being locked away. Ms. Castillo Rosado—who was not yet locked in isolation—felt deterred by the threat that, if she continued with the strike, GEO could lock her away as well. On top of the fear that their children would be confined in isolation rooms, the striking mothers were also afraid that GEO would claim the mothers had a mental illness and send their children to another detention facility. For the most resolute mothers who continued with their strike, GEO maintained a campaign of harassment, including job revocations and price hikes, intrusive videotaping, interference with telephone and email access, denial of visitors, false charges of insurrection, warnings of further punishment for striking, and threats of deportation. An ordinary person would feel deterred by these tactics.

### D.    GEO's Remaining Arguments Are Irrelevant

GEO's brief makes two further arguments: that Plaintiffs have not alleged Warden Thompson's personal involvement, and that Plaintiffs have not alleged "which aspects of the injunctive relief sought could be compelled apart from GEO's contractual duties to ICE." Mot. to Dismiss at 19–20. "Personal involvement" is a term of art for the level of involvement necessary to impose supervisory liability for *Bivens* actions and § 1983 actions seeking damages. Official-capacity claims for injunctive relief, however, are not suits against an official personally, but rather a government entity. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). As for GEO's second argument, it appears that GEO intends to argue that the relief Plaintiffs seek will not redress their injuries because

it is duplicative of GEO's contractual duties to ICE. There is an obvious difference between GEO's contractual duties to ICE—which Plaintiffs may have little power to enforce or modify—and the government's constitutional duties to people in its custody. It would redress Plaintiffs' injuries to obtain an enforceable Court order that tracks the scope of their constitutional rights, not GEO's economic partnership with ICE.

## IV.    Conclusion

For the foregoing reasons, the Court should deny the government's motion to dismiss. In the alternative, the Plaintiffs seek leave to amend the complaint.

Respectfully Submitted,

By:     /S/ Trisha Trigilio
Trisha Trigilio
Texas Bar No. 24075179
Ranjana Natarajan
Texas Bar No. 24071013
THE UNIVERSITY OF TEXAS
SCHOOL OF LAW
Civil Rights Clinic
727 E. Dean Keeton Street
Austin, TX 78705
Tel: 512-232-7222
Fax: 512-232-0800
Email: ttrigilio@law.utexas.edu

Javier N. Maldonado
Texas Bar No. 00794216
Allison N. Boyle, Esq.
Texas Bar No. 24087197
LAW OFFICE OF JAVIER N.
MALDONADO, PC
8918 Tesoro Dr., Ste. 575
San Antonio, TX 78217
Tel: 210-277-1603
Fax: 210-587-4001
Email: jmaldonado.law@gmail.com

*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

By my signature below, I certify that I have served this motion on all counsel of

record via the Court's electronic filing system.

Dated: August 31, 2015                    By: /S/ Trisha Trigilio

                                          Trisha Trigilio
                                          Texas Bar No. 24075179
                                          THE UNIVERSITY OF TEXAS
                                          SCHOOL OF LAW
                                          Civil Rights Clinic
                                          727 E. Dean Keeton Street
                                          Austin, TX 78705
                                          Tel: 512-232-7222
                                          Fax: 512-232-0800
                                          Email: ttrigilio@law.utexas.edu